Henry JOHNSON, Appellant,

v.

STATE of Alaska, Appellee.

No. 5376.

Court of Appeals of Alaska.

April 29, 1983.

A. Lee Petersen, Anchorage, for appellant.

Elizabeth H. Sheley, Asst. Atty. Gen., Anchorage, and Wilson L. Condon, Atty. Gen., Juneau, for appellee.

Before BRYNER, C.J., and COATS and SINGLETON, JJ.

## OPINION

SINGLETON, Judge.

Henry Johnson was convicted of kidnapping, former AS 11.15.260, and rape, former AS 11.15.120. He was sentenced to concurrent fifteen-year sentences with five years suspended on each count. Johnson appeals challenging his conviction and sentence. Johnson contends that the police illegally arrested him in his home without a warrant.[1] He further contends that certain statements which he made conceding that he had engaged in intercourse with the complaining witness at the time in question were the product of the arrest and should have been suppressed.[2] We affirm the judgment of the trial court.

At approximately 3:00 a.m. on March 24, 1979, Johnson kidnapped M.H. from the parking lot of Chilkoot Charlies, an Anchorage nightclub. Johnson initially transported M.H. in her vehicle to a secluded spot where he sexually assaulted her. Thereafter, he returned her to the parking lot, obtained his own vehicle, and took her in that vehicle to his home where he kept her for approximately six hours repeatedly subjecting her to sexual abuse. Johnson fell asleep at approximately 9:30 a.m. M.H. grabbed her clothes, got out of the house and ran directly across the street to a Catholic church. M.H. was able to contact a priest and a nun who immediately called the police. Within thirty minutes, at approximately 10:00 a.m., Officer Patricia Buccilli responded to M.H.'s call for assistance. M.H. told Buccilli that the man who had raped her was a large very muscular black man who was asleep in his house (a duplex) directly across the street. She believed his name was Johnson. Officer Buccilli called for a backup unit, put M.H. in her police car, and drove to the front of the defendant's duplex.

When the officers arrived, Johnson was upstairs in the bedroom asleep. Officer Buccilli hoped to obtain a positive identification from M.H., so she and officer Marquart, who had responded to Buccilli's request for assistance, went to Johnson's front door and knocked. They left M.H. in the police car directly in front of the duplex where she would have an unobstructed view of anyone who came to the door. The record reflects that a friend of M.H., an airport security guard, was also present and agreed to go into the back yard of Johnson's duplex to prevent an escape.

Buccilli rang the doorbell several times. After about thirty to forty-five seconds, she knocked on the door with her night stick jarring it slightly open. Johnson stuck his head out of an upstairs bedroom window and asked Buccilli what she wanted. M.H. testified at trial that she saw Johnson at this point and recognized him as her assailant. At the suppression hearing, however, M.H. was not asked this question and the trial court ruled that M.H. had not been able to see Johnson at the window.

Officer Buccilli told Johnson that they wanted to have him come down for questioning. He said that he would be right down as soon as he got dressed, and "zipped" back in the window. At this point, Officer Buccilli nudged the already open door and walked twelve feet into the downstairs entry to Johnson's apartment. She said she did this because she was afraid Johnson might have a gun. She based this fear on M.H.'s statement to Buccilli that Johnson had threatened to blow her (M.H.) away if she opened her eyes during the trip from Chilkoot Charlies to Johnson's residence and if she did not consent to his sexual demands. It does not appear that M.H. actually saw Johnson with a gun. Officer Marquart was still at the door. In a few moments, Johnson came down the stairs dressed only in a pair of jeans, and saw Officer Buccilli. He asked her what she was doing in his house, and he told her

---

1. Johnson relies on the fourth amendment of the United States Constitution, article I, section 14 of the Alaska Constitution and *Payton v. N.Y.*, 445 U.S. 573, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980).

2. Alaska Rule of Evidence 412 provides that evidence illegally obtained may not be used over defense objection.

he wanted her out. Officer Buccilli told Johnson that they wanted to talk to him about a rape incident that had occurred that morning. He identified himself as Henry Johnson. Buccilli backed up toward the door so that Johnson would follow her, thus allowing M.H. a good view of him from the car. Johnson did follow Buccilli to the door, where M.H. saw him. Officer Buccilli then went back to the car to see if M.H. could identify Johnson as the man who raped her, which she did. Officer Marquart followed Johnson upstairs where Johnson finished dressing. Marquart permitted Johnson to call an attorney at that time. Johnson made three calls but was unsuccessful in reaching counsel. After Buccilli returned from the car, entered the house, climbed the stairs, and informed Marquart of M.H.'s positive identification, Johnson was arrested. Johnson was transported to the police station and given *Miranda* warnings. He refused to answer questions and requested an attorney. Interrogation ceased. A few minutes later he was asked to furnish pubic hair samples. Johnson refused and said, "there's no reason to take any samples because I do admit I did have sex with the woman." He was then asked, "when did you have sex with the woman?" Johnson replied, "well, what do you mean?" The officer said, "well, did you have sex a week ago or did you have sex this morning?" Johnson said, "no, I had sex this morning with her."

### JOHNSON'S ARREST

M.H.'s complaint to Officer Buccilli, coupled with her statement that the sexual assault had occurred in a duplex directly across the street and continued until thirty minutes before M.H.'s interview with Buccilli, gave the police probable cause to believe that a crime had been committed and that the culprit could be found in the residence across the street. Under prior Alaska law, the officers arguably could have entered Johnson's house and given M.H. an opportunity to observe him. Then, if she positively identified him as her assailant, they could arrest him. In *Payton v. New York,* 445 U.S. 573, 100 S.Ct. 1371, 63

L.Ed.2d 639 (1980), the United States Supreme Court held that the fourth amendment prohibits the police from making a warrantless and nonconsensual entry into a suspect's home in order to make a routine felony arrest. Here, the officers had no warrant, and consequently could not under *Payton* have arrested Johnson within his home. However, Johnson committed his crimes on March 24, 1979, almost a year before *Payton* was decided. In *Pascua v. State,* 633 P.2d 1033, 1035–37 (Alaska App. 1981), we held that *Payton* would not be applied retroactively to arrests occurring before it was decided. We followed this decision in *Unger v. State,* 640 P.2d 151, 154–55 (Alaska App.1982), but allowed limited retroactivity where the trial court had anticipated *Payton* and ruled in the defendant's favor. Recently, however, the United States Supreme Court decided *United States v. Johnson,* 102 U.S. 2579, 102 S.Ct. 2579, 73 L.Ed.2d 202 (1982), and held that *Payton* would be applied retroactively to any case that was not final at the time it was decided. Since Johnson's case was pending at the time *Payton* was decided, he is entitled to the benefit of the *Johnson* holding. To the extent that our decisions in *Pascua* and *Unger* are to the contrary, they are in conflict with *Johnson* and must be overruled. We therefore hold, on the authority of *Johnson,* that *Payton* will be applied to all Alaska cases that were not final at the time *Payton* was decided.

A warrantless entry into a person's home to arrest him is *per se* unreasonable and therefore in violation of the state and federal constitutions unless it falls within one of the limited exceptions to the warrant rule. *See, e.g., State v. Myers,* 601 P.2d 239, 241 (Alaska 1979). The trial court found the entry of Johnson's home justified by "exigent circumstances." He concluded that:

> the exigent circumstance as I see it here, it had been about 30 minutes—she—she had given them very good information and description, but they had no way of knowing that this guy was ... still in there, the one that she claimed. She—he

hadn't been identified.... And isn't it reasonable to think that if a person had raped someone, and woke up and found the person he'd raped gone, that he would leave? ... You're saying ... as I understand it, you're saying they should ... have gone and put somebody around this house and taken an hour and a half or 2 hours to go get a search warrant. And they may have been guarding an empty house as far as the defendant is concerned. Sure, they knew ... there was ... a black person in there, but they didn't know who that was until after they had gone in the door and he'd come down the stairs.... There's exigent circumstances and ... the pursuit, and they had every reason to do what they did, and therefore the motion to suppress is denied.

The Alaska Supreme Court, and this court, have addressed the "exigent circumstances" exception to the warrant requirement in a number of cases. These cases might suggest that there are a number of discreet exceptions governing specific situations which must be separately considered. See, e.g. (1) emergency entries, Schultz v. State, 593 P.2d 640 (Alaska 1979) (emergency entry to ascertain cause of fire), Gallmeyer v. State, 640 P.2d 837 (Alaska App. 1982) (emergency entry to neutralize armed suspect in preparation for the rescue of an infant from a place of peril); (2) entries to preserve evidence, Finch v. State, 592 P.2d 1196 (Alaska 1979); (3) entries to make a protective search undertaken to safeguard the officers themselves while carrying out a legal investigation, Mattern v. State, 500 P.2d 228, 231 (Alaska 1972), but see Taylor v. State, 642 P.2d 1378 (Alaska App.1982),

and State v. Spietz, 531 P.2d 521, 525 (Alaska 1975) (searches did not qualify as protective searches); and (4) entries in hot pursuit, Gray v. State, 596 P.2d 1154 (Alaska 1979).

A review of the tests applied indicates, however, that there is one exigent circumstances exception which may arise in a variety of contexts where "there is a compelling need for official action and no time to secure a warrant." Michigan v. Tyler, 436 U.S. 499, 509, 98 S.Ct. 1942, 1949, 56 L.Ed.2d 486, 498 (1978). See 2 W. LaFave, Search and Seizure § 6.1 (1978). In determining whether or not such an emergency exists, trial courts are cautioned to consider a number of factors in evaluating the situation as it appeared to the police prior to the entry: [3] (1) information that a crime had been committed and the seriousness of the crime; (2) information that a suspect or evidence of the crime is in the property to be searched; [4] (3) the extent that the search will intrude on privacy rights; [5] (4) the amount of urgency involved, i.e., could the police have frozen the situation preventing foreseeable injury to persons and property while a warrant was obtained; (5) the time necessary to obtain a warrant; (6) the foreseeable risk to the police guarding the site while a warrant was obtained; (7) information indicating that the concealed suspects or possessors of the evidence in question are aware the police are on their trail; (8) the extent to which the evidence sought is susceptible to ready destruction; (9) the extent of the risk that the suspect will escape and in fleeing harm others, i.e., information that the suspect is armed or has a history of violence;

---

3. These factors are gleaned from Gray v. State, 596 P.2d 1154 (Alaska 1979), Finch v. State, 592 P.2d 1196 (Alaska 1979) and Gallmeyer v. State, 640 P.2d 837 (Alaska App.1982). See Dorman v. United States, 435 F.2d 385 (D.C. Cir.1970); 2 W. LaFave, Search and Seizure § 6.1 (1978 and Supp.1983).

4. The strength of the information available to the police is highly significant. Thus, the court should determine whether the police had probable cause, a reasonable suspicion or merely unsubstantiated speculation.

5. The supreme court is more willing to approve searches of automobiles, see Gray v. State, 596 P.2d 1154, 1157 (Alaska 1979), than it is to approve body searches, see Layland v. State, 535 P.2d 1043 (Alaska 1975), rev'd. on other grounds, Anchorage v. Geber, 592 P.2d 1187, 1191 (Alaska 1979), or residential searches, see State v. Spietz, 531 P.2d 521, 525 (Alaska 1975).

(10) the extent to which the entry may be made peaceably; and finally, (11) the extent to which the entry is motivated primarily by a desire to arrest a suspect or seize evidence, *i.e.,* the possibility that the emergency is a subterfuge to gain entry to search for evidence. It is important to emphasize that a checklist such as this one is an aid to decisionmaking, not a substitute for decisionmaking. It serves to aid a trial judge in evaluating the welter of information generated at a suppression hearing to insure that nothing significant is overlooked. No single factor or group of factors is determinative, however. After all of the factors are identified and measured, the court is still left with the same difficult question previously faced by the police: in light of the totality of the circumstances was there a compelling need for official action and an insufficient time to obtain a warrant? *See Clark v. State,* 574 P.2d 1261 (Alaska 1978); 2 W. LaFave, *Search and Seizure* § 6.1 at 390–395 (1978) (criticizing blind adherence to checklists).

■ M.H. was the victim of a crime who made a prompt outcry. Her statements based on her personal observations provided probable cause to believe two major felonies had been committed: rape and kidnapping. *See Aguilar v. Texas,* 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964); *People v. Johnson,* 15 Cal.App.3d 936, 93 Cal.Rptr. 534 (Cal.App.1971); *State v. Paszek,* 50 Wis.2d 619, 184 N.W.2d 836 (Wis.1971). Her statements also provided probable cause to believe her assailant was in Johnson's residence. When the police entered Johnson's residence they entered peaceably through an unlocked door. The entry followed a

field investigation, and neither officer knew that there would be an arrest or a need to enter Johnson's residence when he or she answered M.H.'s appeal for help.[6] While the two officers had the assistance of M.H.'s friend, an airport security guard, it is not clear that two peace officers could have secured the premises while the third went for a warrant. In any event, Johnson's statement to M.H. that he would "blow her away" if she did not cooperate provided probable cause to believe he was armed with a firearm. Thus, there was reason to believe that, in the event of delay, Johnson might barricade himself in his residence or attempt to flee forcibly, substantially increasing the risk to law enforcement officers and the general public. Further, when Johnson awoke and found M.H. gone, it is reasonable to assume he would be apprehensive about her intentions and that the apprehension would have been confirmed when the police showed up on his front porch. In summary, the police could readily conclude that any delay would substantially increase the risk that Johnson would either attempt to escape while armed or barricade himself in his residence. In addition, while the trial court did not stress the destruction of evidence, there is at least some risk that Johnson would attempt to destroy evidence on his body, *i.e.,* by taking a shower, and on the sheets and blankets indicating that he had had intercourse with M.H.

■ Buccilli's entry was limited as to purpose and intrusiveness. She entered to keep Johnson under temporary surveillance, not to search for evidence, and she only

6. LaFave, in discussing various grounds for entering residences to make arrests states:

[I]t would seem that a solution is most likely to be found by distinguishing the truly "planned" arrest from the arrest which is made in the course of an ongoing investigation in the field. A "planned" arrest is one which is made after a criminal investigation has been fully completed at another location and the police make a deliberate decision to go to a certain place, either the arrestee's home or some other premises where he is believed to be, in order to take him into custody.... On the other hand, when the occasion for arrest arises while the police are already out in the field investigating the prior or ongoing conduct which is the basis for arrest, there should be a far greater reluctance to fault the police for not having an arrest warrant. Here, the presumption should be in favor of a warrantless arrest rather than against it, as the probabilities are high that it is not feasible for the police to delay the arrest while one of their number leaves the area, finds a magistrate and obtains a warrant, and then returns with it. 2 W. LaFave, *Search and Seizure* § 6.1(c), at 391–95 (1978) (footnote omitted).

crossed the threshold of his house. We recognize that the police made a number of entries into Johnson's home after the initial protective search conducted by Officer Buccilli. Once that search is found consistent with Johnson's constitutional rights, however, it becomes clear that the other entries were constitutional. When Johnson appeared on the threshold of his residence, the officers could seize him without a warrant, so long as they had a constitutional basis to do so. *United States v. Santana,* 427 U.S. 38, 96 S.Ct. 2406, 49 L.Ed.2d 300 (1976); 2 W. LaFave, *Search and Seizure* § 6.1, at 120 n. 73.1 (Supp.1983). M.H.'s statements to the police provided reasonable suspicion that Johnson had committed serious crimes warranting the police in temporarily detaining him until M.H. could observe him and determine if she could identify him as her assailant. *Coleman v. State,* 553 P.2d 40, 43–47 (Alaska 1976). It was not unreasonable for the officers to accomodate Johnson by permitting him to go back into his house to finish dressing and to enable him, if he could, to contact counsel. But concern that Johnson had recently committed two serious felonies, *i.e.,* rape and kidnapping, and that he might be armed, justified the police in keeping him under surveillance after he reentered his residence. *Washington v. Chrisman,* 455 U.S. 1, 102 S.Ct. 812, 70 L.Ed.2d 778 (1982). These legitimate concerns serve to distinguish this case from *Taylor v. State,* 642 P.2d 1378 (Alaska App. 1982). By the same token, once Johnson was seized, it would have been a useless exercise to have Officer Marquart keep him under surveillance in his bedroom while Officer Buccilli, armed with M.H.'s positive identification, sought out a magistrate for an arrest warrant.

█ In light of the totality of the circumstances, Judge Moody's holding that the

entries in this case were justified by exigent circumstances was not clearly mistaken.[7]

## JOHNSON'S RIGHT TO COUNSEL

Johnson argues that irrespective of the legality of his arrest, his statements that he had intercourse with M.H. that morning should have been suppressed. Johnson reasons that the admissions were obtained in violation of his rights under the fifth and sixth amendments of the United States Constitution and their Alaska equivalents, Alaska Const. art. 1 §§ 9 and 11. *See Edwards v. Arizona,* 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378, *reh. den.,* 452 U.S. 973, 101 S.Ct. 3128, 69 L.Ed.2d 984 (1981). In *Edwards,* the supreme court held that once a person in custody requests an attorney all interrogation must cease and any admissions obtained from a defendant will be deemed in violation of that defendant's constitutional rights unless he initiated contact.

█ The state argues, and the trial court found, that the police request that Johnson submit to a combing for pubic hairs did not constitute interrogation and therefore Johnson's statement that such a test was unnecessary because he had had intercourse with that woman was not obtained in violation of *Edwards.* The court found, and the state concedes, that the subsequent request for clarification, *i.e.,* "when did you have intercourse with the woman?" was interrogation. The state argues, nevertheless, that the trial court's finding that, under the totality of the circumstances, Johnson waived his fifth amendment rights is correct. We agree with the trial court's resolution of these issues.

The supreme court's recent decision in *South Dakota v. Neville,* —— U.S. ——, 103 S.Ct. 916, 74 L.Ed.2d 748 (1983), seems dis-

7. Johnson also argues that the police independently violated AS 12.25.100, which precludes entry into a residence by a police officer unless he knocks and announces his authority and purpose and is refused entry. Johnson conceded that the police substantially complied with the requirement that they announce their identity and purpose, *see Lockwood v. State,* 591

P.2d 969 (1979), but contends that Buccilli entered before Johnson denied her admittance. We are satisfied that the exigent circumstances found warranted Buccilli in entering without being expressly refused admittance. *See* 2 LaFave, *Search and Seizure* § 4.8(c) and § 6.2(d) (1978).

positive of the first question. There the court said:

> In the context of an arrest for driving while intoxicated, a police inquiry of whether the suspect will take a blood-alcohol test is not an interrogation within the meaning of *Miranda.* As we stated in *Rhode Island v. Innis,* 446 U.S. 291, 301 [100 S.Ct. 1682, 1689, 64 L.Ed.2d 297] (1980), police words or actions "normally attendant to arrest and custody" do not constitute interrogation. The police inquiry here is highly regulated by state law, and is presented in virtually the same words to all suspects. It is similar to a police request to submit to fingerprinting or photography. Respondent's choice of refusal thus enjoys no prophylactic *Miranda* protection outside the basic Fifth Amendment protection. See generally Areneila, *Schmerber and the Privilege Against Self-Incrimination: A Reappraisal,* 20 Am.Crim.L.Rev. 31, 56–58 (1982).

*Id.* at —— n. 15, 103 S.Ct. at 923 n. 15. *Accord Palmer v. State,* 604 P.2d 1106, 1109 (Alaska 1979).

Like breathalyzer examinations in drunk driving cases, pubic hair combing is a standard investigatory technique in rape cases. Delay in requesting permission might well lead to the disappearance of any evidence.

We also agree with the trial court's conclusion that the follow-up question constituted interrogation. There is authority for the proposition that if such follow-up questions are provoked by a defendant's spontaneous outburst they do not constitute interrogation. *See State v. Lane,* 414 So.2d 1223, 1226–27 (La.1982); *State v. Porter,* 303 N.C. 680, 281 S.E.2d 377, 385–86 (N.C. 1981). However, we believe the language in *Edwards* is conclusive on the issue. There, the supreme court said:

> If, as frequently would occur in the course of a meeting initiated by the accused, the conversation is not wholly one-sided, it is likely that the officers will say or do something that clearly would be "interrogation." In that event, the question would be whether a valid waiver of

the right to counsel and the right to silence had occurred, that is, whether the purported waiver was knowing and intelligent and found to be so under the totality of the circumstances, including the necessary fact that the accused, not the police, reopened the dialogue with the authorities.

*Edwards v. Arizona,* 451 U.S. at 486 n. 9, 101 S.Ct. at 1885 n. 9, 68 L.Ed.2d at 387 n. 9.

The trial court's ultimate conclusion that Johnson waived his fifth amendment rights when he clarified his earlier statement was not error. *Wyrick v. Fields,* —— U.S. ——, 103 S.Ct. 394, 74 L.Ed.2d 214 (1982). Under the totality of the circumstances, we are satisfied that the trial court did not err in finding that Johnson acted knowingly, intelligently and voluntarily. He clearly knew his *Miranda* rights since he invoked them. He also knew that they would be honored as he saw the interrogation cease. Therefore, his decision to concede intercourse could arguably have resulted from his evaluation of the evidence known to him, *i.e.,* M.H.'s knowing his residence and bringing the police there, fear that his pubic hairs would disclose physical evidence of intercourse and a determination that consent was his best defense. We find nothing in the record that would support a conclusion that the statements were involuntary, *i.e.,* provoked by unlawful police conduct. Under these circumstances, the trial court did not err in finding a waiver of Johnson's fifth amendment rights including the *Miranda* protection.

■ Under federal law, Johnson's right to counsel did not accrue until he had been formally charged at arraignment, preliminary hearing or by grand jury indictment. *Brewer v. Williams,* 430 U.S. 387, 97 S.Ct. 1232, 51 L.Ed.2d 424 (1977). While Johnson had been arrested, and had indicated an intent to retain counsel, he had not been formally charged at the time he made the statements in question. There was, therefore, no violation of Johnson's sixth amendment rights under federal law. Nevertheless, Johnson's right to counsel may have accrued at an earlier time under Alaska

law. *Copelin v. State,* 659 P.2d 1206 (Alaska, 1983); *Blue v. State,* 558 P.2d 636, 642 (Alaska 1977). In this case Johnson intended to retain counsel from the time of his arrest. The police did not hinder him. in contacting counsel but in fact assisted him in his unsuccessful efforts to contact counsel. AS 12.25.150 and Alaska R.Crim.P. 5(b). Consequently, the request that Johnson submit to a combing of his public hairs did not violate Johnson's constitutional right to counsel under the statute or the state constitution. *See Sheakley v. State,* 644 P.2d 864, 868–69 (Alaska App.1982).

▇▇▇ Johnson argues that the court erred in permitting the prosecution to offer evidence of his refusal to submit to pubic hair combing and in denying his motion for mistrial on this basis. Johnson is correct that a mere refusal to submit to a search is privileged under Alaska law and cannot be used at trial against the person refusing. *Elson v. State,* 659 P.2d 1195 (Alaska, 1983). This is true whether the defendant's consent is necessary for the search to be legal or not. *Id.* In *Elson,* the supreme court distinguished between (1) refusal to submit to typical searches governed by the fourth amendment which, depending upon the circumstances, may or may not be legal without the defendant's consent and (2) refusals to provide non-testimonial evidence which, under federal constitutional law at least, is entitled to no protection. The court established a privilege against comment in the first case but reserved judgment on the evidentiary use of a failure to consent in the latter case.

▇▇▇ In *Liston v. State,* 658 P.2d 1346 (Alaska App.1983), we examined the issue of requests of an incarcerated defendant for non-testimonial evidence. We distinguished between two types of requests based on whether granting the request would or would not cause a reasonable per-

son in the position of the defendant great physical pain or mental or emotional suffering or embarrassment. If not, neither consent nor a warrant were required; where however, the "search" would subject the person searched to pain or embarrassment, we required consent or a court order. For the distinction and its legal effect, we relied on *Cupp v. Murphy,* 412 U.S. 291, 93 S.Ct. 2000, 36 L.Ed.2d 900 (1973). It is not necessary for us to determine whether the court which decided *Elson* would draw the same distinction and place pubic hair combing in the latter category and extend the evidentiary privilege it established in that case to a refusal to permit pubic hair combing. We are satisfied that the *Elson* rule, where it applies, is limited to refusals to permit searches and does not privilege actual admissions of guilt. The supreme court reasoned that a refusal to consent to a search could be based on two significantly different reasons: (1) a good faith though perhaps mistaken assertion of constitutional rights or (2) fear of disclosing evidence. The court concluded that to require a defendant to guess at his constitutional rights on pain of providing the prosecution with adverse evidence was too high a price to pay. In the court's view, this was particularly true when the probative value of the evidence as an adverse inference of guilty knowledge was very weak. Here, in contrast, we have an admission of an element of the crime which is evidence of very high probative value. More important, Johnson was not faced with the dilemma of whether (1) to surrender his right not to be searched or (2) to provide the state with adverse evidence. He could have merely refused the search without embellishing his refusal with an admission that he had intercourse with M.H.

The judgment of the superior court is AFFIRMED.[8]

---

8. Johnson raises three other issues which we briefly address:

(a) Johnson argues that the trial court erred in denying his motion for mistrial when a witness initially refused to answer preliminary questions about his occupation and address and twice blurted out that he feared reprisals,

presumably from Johnson. The trial court promptly admonished the jury to disregard the statement and subsequently repeated the admonition in greater detail. Neither party referred to the matter again. Under the circumstances denial of the motion for mistrial was

not an abuse of discretion. *Roth v. State,* 626 P.2d 583 (Alaska App.1981).

(b) Johnson is black and his victim is white. Three black people were on the jury panel. Johnson preempted two of them; a woman, because she didn't approve of interracial dating, and a man, because he worked with the victim. The prosecution preempted the third black person without giving a reason. Johnson objected citing *People v. Wheeler,* 22 Cal.3d 258, 148 Cal.Rptr. 890, 583 P.2d 748 (Cal.1978) (prosecution's exercise of peremptory challenge based solely on group affiliation violates constitutional right to jury drawn from a representative cross-section of the community). The trial court held that a single peremptory challenge did not establish a prima facie case of group bias requiring the prosecution to explain its reason for the peremptory challenge. We agree.

(c) Johnson was convicted of rape and kidnapping. He received concurrent sentences of fifteen years with five years suspended. He appeals contending that the sentence was excessive. We disagree. Johnson had one prior felony conviction and a misdemeanor conviction for a crime of violence. The sentence was therefore not clearly mistaken. *Davis v. State,* 635 P.2d 481, 487–88 (Alaska App.1981) (twenty-year sentence for kidnapping and fifteen-year concurrent sentence for rape not excessive).