STATE of Alaska,
Petitioner/Cross–Respondent,

v.

Charles LEWIS,
Respondent/Cross–Petitioner.

Nos. A–3069, A–3099.

Court of Appeals of Alaska.

April 12, 1991.

Cynthia M. Hora, Asst. Atty. Gen., Office of Special Prosecutions and Appeals, Anchorage, and Douglas B. Baily, Atty. Gen., Juneau, for petitioner/cross-respondent.

Jeffrey K. Rubin, Law Offices of Friedman & Rubin, Anchorage, for respondent/cross-petitioner.

Before BRYNER, C.J., COATS, J., and ANDREWS, District Court Judge.*

COATS, Judge.

BRYNER, Chief Judge, with whom ANDREWS, Judge, joins, concurring.

On August 25, 1988, a grand jury indicted Charles G. Lewis on charges that he unlawfully possessed heroin, a class A felony offense, and that he possessed cocaine, a class C felony offense. AS 11.71.020(a); AS 11.71.040(a)(3)(A). The state based these charges on evidence which police found in Lewis' apartment on June 19, 1988. On June 29, 1989, Superior Court Judge Mark C. Rowland granted Lewis' motion to suppress the evidence which the police discovered when they entered Lewis' apartment. The state petitioned for review from this decision and Lewis filed a cross-petition for review. We granted both petitions. We now affirm Judge Rowland's decision suppressing the evidence against Lewis.

The facts of this case are generally undisputed. On the night of June 18, 1988, Officers William Miller and Daniel Cole were working undercover attempting to buy cocaine. Officers Alan Jessen and Barry Reid were helping them. Miller and Cole went to Chilkoot Charlie's, where Miller talked to a man named "Mike" about buying some drugs. Miller and Mike went to two phone booths where Mike made some phone calls to attempt to locate cocaine suppliers; Cole took up surveillance with the other two officers.

While at a phone booth, Miller and Mike were approached by Glenn King and Jeffrey Moffet, who offered to sell Miller some cocaine. Miller had never met either of these men before. King made some phone calls, but was unable to locate anyone who could sell them cocaine. Moffet and King suggested they walk to a nearby apartment where they knew a dealer. They all walked to Camelot Apartments at 40th and Minnesota. Upon reaching the apartment complex, Miller gave King $200 in prerecorded buy money. Before King went to get the cocaine, the three men discussed what they would do in the event that they were ripped off. When Miller suggested they could go to the apartment to get the money back, he was told that was not a good idea because guys in the apartment had "guns or weapons or something."

Moffet and Miller waited near the northwest corner of the apartment complex while King went up to the third floor of one of the buildings; Miller watched King go to an apartment door. From where Miller was standing, he could not see the apartment number on the door. The people in the apartment would not let King in. Moffet said he would try to buy drugs because he knew the people in the apartment. Moffet told Miller the apartment number was 35. Moffet took the $200 and Miller watched him go to the same apartment door to which King had gone. Miller could not see Moffet entering the apartment. Miller and King wandered to the north corner of 40th to wait for Moffet. From that point, they could not see the front of the apartment, but they could see the apartment windows.

Moffet returned a short time later. He was very excited and said they had to leave the area quickly because there was a quarter-pound deal going on in the apartment, and the people in the apartment did not want any attention drawn to them. The three men started walking eastbound on 40th, and Moffet handed Miller three bindles which later field testing indicated was cocaine.

Just past the intersection of 40th and Garfield, Miller gave the surveillance officers a prearranged signal and the other officers converged on the scene. Moffet and King were arrested and searched; the $200 in prerecorded buy money was not found on either of them. This location was about 200 yards away from the apartment; the officers could see the window on the east side of the apartment. The police moved to a new location which was out of sight of the apartment window and called for back-up officers in marked police cars.

* Sitting by assignment made pursuant to article IV, section 16 of the Alaska Constitution.

The police officers stayed in this new location for about fifteen minutes. During these fifteen minutes, no one was watching the front door of the apartment. The officers decided they would secure the apartment, and then get a search warrant. The reason for the search warrant was the information the officers had received concerning the quarter-pound deal. Reid then moved to a position where he could keep an eye on the apartment door.

At approximately 3:00 a.m., Miller and Jessen went to verify that the apartment Moffet and King had gone to was number 35; neither officer was in uniform. On their way to the apartment, a man in another apartment asked them what they were doing. Miller knocked on the door to apartment number 35; Lewis opened the door and stepped outside the apartment. The officers explained what was going on and entered the apartment. As the officers entered, they had their guns drawn. Although Lewis offered no resistance, and was not placed under arrest, he was frisked and put in handcuffs. Lewis remained handcuffed in the apartment for the next two hours. Reid testified that he handcuffed Lewis because he saw a karate belt on the fireplace and it made him uncomfortable. The only other person in the apartment was a woman who was sitting on a couch in the living room.

Miller conducted a search of the apartment for other occupants and weapons; he did not look in any drawers or other containers. He did not find any weapons or additional people. During this search, Miller saw an open stenographer's pad on the coffee table in front of the couch. The exposed page contained two columns; one with names, the other with figures. Miller testified that this pad appeared to be a financial record of a drug transaction.

Miller and Jessen went to apply for a search warrant, while other officers stayed at the apartment. While Miller and Jessen were on their way to the magistrate, the officers in the apartment continued to search and radioed to Miller and Jessen that there were computer disks and a radio scanner in the apartment, and that the scanner was turned to the channel used by the police.

At 4:30 a.m., Miller appeared before Magistrate Brian Johnson. He told the magistrate about the steno pads, the scanner, and the computer disks, and described his contacts with Moffet and King.

Magistrate Johnson issued a search warrant at 4:45 a.m., authorizing seizure of drugs, drug paraphernalia, prerecorded buy money, financial records, and the stenographer's pad, and directed that it be executed immediately. He refused to authorize seizure of the computer disks. A search of the apartment produced cocaine, heroin, scales, a grinder, phone books, the stenographer's pad, and a fair amount of money. The police never recovered the prerecorded buy money.

Lewis moved to suppress all of the evidence which the police seized from his apartment on numerous grounds. In essence, he contended that the police lacked probable cause to make the initial warrantless entry of his apartment. He contended that the search warrant was based on evidence which the police found during the initial warrantless searches and that therefore the warrant was invalid.

The state contended that the police were justified in initially entering Lewis' apartment because of exigent circumstances. The state claimed that all of the evidence which the police observed during this entry was in plain view. The state contended that even if Judge Rowland found that the police acted improperly when they initially entered Lewis' apartment, the evidence which the police obtained was admissible under the doctrines of inevitable discovery and independent source, because the police had ample probable cause to search Lewis' apartment before they entered the apartment. The state claimed that the police entered Lewis' apartment in good faith based upon what they believed were exigent circumstances, and that all of the evidence which the police found was either discovered due to a valid warrant or would have been inevitably discovered under the warrant.

Judge Rowland granted Lewis' suppression motion. He concluded that the exigent circumstances were not sufficient to justify entering Lewis' apartment without a warrant. In making this decision, Judge Rowland emphasized that to the extent the police had reliable information that a sale of a quarter-pound of cocaine was occurring in Lewis' apartment, the police did not observe Lewis' apartment during the fifteen- to twenty-minute gap in surveillance between the time that Moffet left the apartment and the police reestablished surveillance. Given this gap in surveillance, Judge Rowland concluded that the police did not have a sufficient ground to assume that they would be unable to arrest the people involved in the quarter-pound transaction if they did not act immediately.

Judge Rowland found that the officers did act in good faith. He concluded that the police had probable cause to support a search warrant even before they initially entered Lewis' apartment. However, he concluded that this was not an appropriate case to apply the doctrines of independent source and inevitable discovery. Judge Rowland pointed out that in this case, the police did not have probable cause to arrest Lewis at the time they entered his apartment. He found that the police actions constituted a substantial invasion of Lewis' rights. He concluded that it would be poor policy to allow the state to avoid suppression of evidence by applying the doctrines of inevitable discovery and independent source. He reasoned that if courts so held, that decision would encourage police to violate the constitution in cases such as this to insure against the risk that suspects would destroy evidence. He accordingly ordered the evidence suppressed.

## EXIGENT CIRCUMSTANCES

In deciding that the exigent circumstances in this case were not sufficient to justify the original police entry into Lewis' apartment, Judge Rowland applied the eleven factors which we set forth in *Johnson v. State*, 662 P.2d 981, 985–86 (Alaska App.1983). The parties agree that this is the correct standard. In *Johnson*, we summarized the standard as follows:

> After all the factors are identified and measured, the court is still left with the same difficult question previously faced by the police: in light of the totality of the circumstances was there a compelling need for official action and insufficient time to obtain a warrant?

*Id.* at 986 (citations omitted).

■ We do not believe that Judge Rowland's conclusion, that the exigent circumstances were not sufficient to authorize the police to enter Lewis' apartment without a warrant, was clearly erroneous. At the time that the police initially entered the apartment, they had probable cause to believe that Moffet had purchased cocaine in that apartment. They also knew that Moffet was excited when he exited the apartment and stated "that there was a quarter-pound deal going on in the apartment" so that the occupants did not want anyone to draw attention to them. Miller testified that he did not have any information about how reliable Moffet was as an informant. In addition, following the time that Moffet purchased the cocaine, the police were not able to observe Lewis' apartment for a period of fifteen to twenty minutes. Miller testified that drug sales normally took place within a short period of time. Under these circumstances, Judge Rowland could properly conclude that the police did not have a strong basis to believe that they would be able to intercept a substantial drug sale if they entered Lewis' apartment immediately. Moffet's statement was conclusory and uncorroborated except for his own purchase of cocaine. Assuming that Moffet actually saw the drug transaction taking place, Judge Rowland could properly conclude that there was a substantial likelihood that the drug transaction would have been completed during the fifteen- to twenty-minute gap when the police did not observe Lewis' apartment. In making his finding, Judge Rowland pointed out that the police substantially invaded Lewis' privacy in entering his apartment. At the time they entered, the police did not have probable cause to arrest Lewis. Moffet did not identify who sold him the cocaine, and

the police were unable to witness the sale. Under these circumstances, we conclude that Judge Rowland did not err in finding that the police were not faced with sufficient exigent circumstances to justify the entry into Lewis' apartment.

## INEVITABLE DISCOVERY AND INDEPENDENT SOURCE

■ The independent source doctrine allows the state to admit evidence when the evidence was obtained through information which was wholly independent of the illegal police conduct. The leading cases are *Segura v. United States*, 468 U.S. 796, 104 S.Ct. 3380, 82 L.Ed.2d 599 (1984), and *Cruse v. State*, 584 P.2d 1141 (Alaska 1978). In *Cruse*, the police seized a car while arresting its occupants for robbery. A state trooper looked in the trunk of the car prior to having the car impounded. An Anchorage police officer observed evidence in the trunk when the trooper opened the trunk. The officer closed the trunk until he could get a warrant. The officer testified before a magistrate as to all of the information which he had to establish probable cause for searching the trunk of the car. However, the officer did not tell the magistrate that he had seen inside the trunk until after the magistrate issued the warrant. *Id.* at 1143. The Alaska Supreme Court held that, assuming the original search of the trunk was illegal, the subsequent search warrant was not a product of the prior illegal search of the trunk. *Id.* at 1145. The supreme court pointed out that

> The controverted evidence here was obtained through information wholly independent of the initial trunk search. The evidence presented to the district court in support of the search warrant was procured without resort to any clue or knowledge gained from the trunk search. The investigation leading to the lawful search was not intensified or significant-

ly focused by reason of any tainted information. Moreover, there was no exploitation of the alleged misconduct to discover new evidence as prohibited by *Wong Sun v. United States, supra* [371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963)]. The exclusionary rule extends only to those facts which were actually discovered through a direct process initiated by the unlawful act. Where the disputed evidence stems from an independent and lawful source, even though it could have emerged from the prior unlawful search as well, the evidence is admissible.

*Id.* at 1145 (citations omitted) (footnotes omitted).[1]

*Segura* is the leading federal case on the independent source doctrine.[2] *Segura*, 468 U.S. at 796, 104 S.Ct. at 3380. In that case, the police arrested Segura in his apartment building on charges that he sold cocaine and took him up to his apartment where they knocked on the door. When someone answered, the police entered the apartment and secured it until they could obtain a search warrant. In the process of securing the apartment, the police found some evidence which they seized. The search warrant was issued approximately nineteen hours after the police initially entered the apartment. The police then thoroughly searched the apartment, finding more evidence. The Supreme Court held that, assuming the original entry of the apartment was illegal, there was an independent source for the challenged evidence since the evidence was obtained during a search of Segura's apartment pursuant to a valid warrant. The Court concluded that the information on which the warrant was based came from sources which were wholly unconnected with the initial entry of the apartment and was known to the agents before that entry. *Id.* There was a strong dissent in *Segura* by four members of the

1. The supreme court disapproved of the police officer withholding the information that he had looked in the trunk. The court concluded that "police and prosecutors owe a duty of candor to the court, particularly in light of the *ex parte* nature of these proceedings, and must not with-

hold information which may taint the source of the probable cause they put forth." *Id.* at 1146 (footnote omitted).

2. *See also Murray v. United States,* 487 U.S. 533, 108 S.Ct. 2529, 101 L.Ed.2d 472 (1988).

Court. *Id.* at 817–40, 104 S.Ct. at 3391–3404.

■ We conclude that Judge Rowland did not err in deciding that the independent source doctrine should not save the evidence in this case from suppression. In the first place, the state is asking us to extend the independent source doctrine beyond the facts of *Cruse* and *Segura* in two significant ways. First, in neither *Cruse* nor *Segura* did the government rely on illegally obtained information to obtain a warrant. In both *Cruse* and *Segura*, the court issued the warrants based solely on information which the government obtained before any illegal search. Although we do not disagree with Judge Rowland that the police had sufficient probable cause to obtain a search warrant before they entered Lewis' apartment, the fact remains that the state did use information which they obtained after illegally entering Lewis' apartment to obtain the search warrant. Thus, the search warrant is not wholly independent of the initial illegal entry.

Second, as Judge Rowland pointed out, the police entry in this case was a substantial invasion of privacy. This is particularly true when we compare the facts of Lewis' case to *Cruse*. However, in Segura's case, Segura was legally under arrest at the time the police entered his apartment. This was a factor which was significant to at least two justices who were in the majority. *Id.* at 813, 104 S.Ct. at 3389–90. *See* W. LaFave, *Search and Seizure* § 6.5(c) at 674–76 (2d ed. 1987). In this case, the police did not have probable cause to arrest

Lewis or anyone in Lewis' apartment at the time they entered.

■ In addition to these factors, we also agree with Judge Rowland's conclusion that the Alaska Supreme Court would adopt the position of the dissenting justices in *Segura* and of Professor LaFave, in deciding this case under art. 1 § 14 and art. 1 § 22 of the Alaska Constitution. There is always the danger that suspects will destroy evidence before the police can get a warrant. The police invariably have an incentive to enter a residence before a warrant arrives to prevent the destruction of evidence. As the four dissenting justices stated in *Segura:*

> The agents impounded this apartment precisely because they wished to avoid risking a loss of access to the evidence within it. Thus, the unlawful benefit they acquired through the impoundment was not so "attenuated" as to make it unlikely that the deprivation of that benefit through the exclusionary rule would have a deterrent effect. To the contrary, it was exactly the benefit identified by the District Court—avoiding a risk of loss of evidence—that motivated the agents in this case to violate the Constitution. Thus, the policies underlying the exclusionary rule demand that some deterrent be created to this kind of unconstitutional conduct.

*Segura,* 468 U.S. at 836–37, 104 S.Ct. at 3402. This language is quoted with approval in W. LaFave, *Search and Seizure* § 11.4(f) at 429–30. We find this reasoning persuasive and believe that it supports Judge Rowland's ruling in this case. We accordingly affirm Judge Rowland's decision.[3]

---

**3.** The state also urges us to adopt the inevitable discovery doctrine which is related to the independent source doctrine. The inevitable discovery doctrine applies to evidence which was discovered during an initial illegal search, but which would inevitably have been discovered through lawful means. If the prosecution can establish by a preponderance of the evidence that the information "ultimately or inevitably would have been discovered by lawful means," this doctrine holds that the evidence should be admitted. *Nix v. Williams,* 467 U.S. 431, 444, 104 S.Ct. 2501, 2509, 81 L.Ed.2d 377 (1984). The doctrine of inevitable discovery has not been applied in Alaska. *See Ricks v. State,* 771

P.2d 1364, 1369 n. 3 (Alaska App.1989) (state failed to meet its burden of proof under the inevitable discovery doctrine). We believe that the decision in this case turns on the analysis of the independent source doctrine as stated in *Cruse* and *Segura.* Therefore, we need not reach the issue of whether to adopt the inevitable discovery doctrine. However, even if we were to adopt this doctrine, we do not believe that the state has shown that there was any independent investigation which would have inevitably discovered the information in question. Therefore, we do not independently analyze this case under the inevitable discovery doctrine.

AFFIRMED.

BRYNER, C.J., with whom ANDREWS, J., joins, concur.

BRYNER, Chief Judge, with whom ANDREWS, Judge, joins, concurring.

As this court's opinion recognizes, the independent source doctrine, as adopted by a majority of the Supreme Court in *United States v. Segura*, 468 U.S. 796, 104 S.Ct. 3380, 82 L.Ed.2d 599 (1984), is inapplicable here because the unlawful entry and search in this case impinged upon Lewis' right to privacy and because the police relied on information gained from their unlawful conduct to secure the challenged search warrant. For this reason, it is unnecessary to determine whether the dissenting view in *Segura* should be followed as a matter of state constitutional law. I would leave the decision of that important constitutional issue—which the parties here have not addressed—to a case in which it is squarely presented. In all other respects, I join in the court's opinion.