2008 ND 87

**Kenneth Paul HOOVER, Petitioner and Appellant**

v.

**DIRECTOR, NORTH DAKOTA DE-PARTMENT OF TRANSPORTA-TION, Respondent and Appellee.**

No. 20070258.

Supreme Court of North Dakota.

May 15, 2008.

Michael Ray Hoffman, Bismarck, N.D., for petitioner and appellant.

Michael Trent Pitcher, Assistant Attorney General, Office of Attorney General, Bismarck, N.D., for respondent and appellee.

CROTHERS, Justice.

[¶ 1] Kenneth Paul Hoover appeals from a judgment affirming the Department of Transportation's suspension of his driving privileges for 180 days for driving under the influence of alcohol. We conclude there was sufficient evidence to establish that Hoover was the driver of a vehicle involved in a hit and run accident and that a police officer did not violate Hoover's Fourth Amendment rights by making a warrantless entry into Hoover's bedroom. We affirm.

I

[¶ 2] At 9:50 p.m. on March 3, 2007, Nicole Heintz was driving south on north Washington Street in Bismarck and stopped in the left turn lane to turn east on Boulevard Avenue. While Heintz was stopped, a "little red ... kind of a sports car" turning north from Boulevard Avenue struck the front of her vehicle and continued north until it became stuck in snow along the side of the road. Heintz noted the license plate number, called police with her cell phone, and then saw that the red car was leaving, heading north. It was dark at the time, and Heintz and a witness to the accident were unable to identify the driver of the red car or ascertain whether the car contained any other occupants. The witness saw the red car turn east on Sioux Avenue. Officer Jerry Stein from the Bismarck Police Department arrived on the scene at 9:55 p.m. Heintz and the witness told Stein what had happened and

gave him the license plate number. Stein ran the license plate number through dispatch and learned the vehicle was a 1993 Ford Probe registered to Hoover who lived on north Washington Street about one and one-half blocks from the scene of the accident. Stein went to Hoover's address but did not see the red car.

[¶ 3] Stein knocked on the door of the house, and Hoover's son answered. Hoover's son's girlfriend was also in the room. Hoover soon came to the door. Stein told him he was investigating a motor vehicle accident and asked him if he was okay. Stein believed Hoover was "very intoxicated" because:

"[Hoover] [h]ad a difficult time standing. Kept leaning against the walls, doors, to maintain his balance, almost falling over several times. His speech was very slurred. He had a hard time understanding my questioning. His eyes were glazed over and bloodshot. I could detect a strong odor of alcohol ... respirated alcohol coming from his breath."

Hoover told Stein he had not been driving that evening. Stein asked Hoover if he could see the car, and Hoover "invited me into the house to look at the vehicle," which was parked in an attached garage. According to Stein, Hoover "actually opened the door, ... and he stepped aside and said ... motioned for me to come on in."

[¶ 4] At the administrative hearing, Stein described what followed:

"OFFICER STEIN: [B]oth he and I walked over to the garage, and then the garage was about five steps down to the garage that were steep. And he couldn't walk down them due to his intoxication, so he stayed at the top of the steps, while I looked at the vehicle and could see damage to the front driver's side portion. I touched the hood, and it was warm to the touch, and I could feel steam radi ... or heat radiating from it. There was also mist in the garage, as though, I believe it was radiator fluid that was leaking and then dispersing into the air.

MS. VARVEL: Any other observations?

[OFFICER STEIN]: I continued to ask him what was going on, and if he was hurt, and he kept on trying to get away from me to get to his bedroom. That's when he told me he was at Los Amigos and had a couple of shots. So then he said he had to get his registration card out of his bedroom, which was up about five steps from where the entrance to the garage is.

MS. VARVEL: Then what happened?

OFFICER STEIN: As we got to his bedroom, he stumbled over to his dresser, grabbed a bottle of whiskey off the top of the dresser, which was ... it was on the other side from the bedroom, ten to twelve feet away. Took the cork off the bottle of whiskey, and at that time I grabbed the bottle out of his hand, and he pulled away from me. And I took the bottle of whiskey from him before he had a chance to drink anything from it and forcibly took him to the ground in straight arm bar.

MS. VARVEL: What happened next?

OFFICER STEIN: I was able to achieve compliance through a pressure-point control tactic, and I handcuffed Mr. Hoover and told him he was under arrest for DUI. That's when he stated that he'd F'd up."

Hoover consented to a blood test which was taken at 10:56 p.m. The results showed a blood-alcohol concentration of .26 percent.

[¶ 5] Following the administrative hearing, the Department suspended Hoover's driving privileges for 180 days. The hearing officer concluded Stein had rea-

sonable grounds to believe Hoover had been driving under the influence of alcohol in violation of N.D.C.C. § 39–08–01 at "the time he was involved in a two-vehicle accident as a driver." Hoover appealed to district court, arguing there was insufficient evidence he was driving and arguing Stein illegally entered his bedroom without a warrant. The district court ruled Stein had probable cause to arrest Hoover for driving under the influence and Hoover's constitutional rights were not violated when Stein entered his bedroom.

## II

[¶ 6] Our review of an administrative suspension of a driver's license is governed by the Administrative Agencies Practice Act, N.D.C.C. ch. 28–32. *Brewer v. Ziegler*, 2007 ND 207, ¶ 4, 743 N.W.2d 391. We will affirm the agency's decision unless:

"1.  The order is not in accordance with the law.

2.  The order is in violation of the constitutional rights of the appellant.

3.  The provisions of this chapter have not been complied with in the proceedings before the agency.

4.  The rules or procedure of the agency have not afforded the appellant a fair hearing.

5.  The findings of fact made by the agency are not supported by a preponderance of the evidence.

6.  The conclusions of law and order of the agency are not supported by its findings of fact.

7.  The findings of fact made by the agency do not sufficiently address the evidence presented to the agency by the appellant.

8.  The conclusions of law and order of the agency do "not sufficiently explain the agency's rationale for not adopting any contrary recommendations by a hearing officer or an administrative law judge."

N.D.C.C. § 28–32–46.

[¶ 7] This Court "review[s] an appeal from the determination of an administrative agency based only on the record filed with the court." N.D.C.C. § 28–32–46. We do "'not make independent findings of fact or substitute our judgment for that of the agency' when reviewing an administrative agency's factual findings." *Sayler v. North Dakota Dep't of Transp.*, 2007 ND 165, ¶ 7, 740 N.W.2d 94 (quoting *Kiecker v. North Dakota Dep't of Transp.*, 2005 ND 23, ¶ 8, 691 N.W.2d 266). "We determine only whether a reasoning mind reasonably could have determined the factual conclusions reached were proved by the weight of the evidence from the entire record." *Sayler*, at ¶ 7. "'If the hearing officer's findings of fact are supported by a preponderance of the evidence, the conclusions of law are sustained by the findings of fact, and the decision is supported by the conclusions of law, we will not disturb the decision.'" *Brewer*, 2007 ND 207, ¶ 4, 743 N.W.2d 391 (quoting *Borowicz v. North Dakota Dep't of Transp.*, 529 N.W.2d 186, 187 (N.D.1995)). "[W]e ... review questions of law de novo." *Sayler*, at ¶ 7.

### A

[¶ 8] Hoover argues the Department erred in concluding Officer Stein had reasonable grounds to believe that Kenneth Hoover had been driving under the influence.

[¶ 9] One of the determinations the Department must make to suspend a driver's license under N.D.C.C. § 39–20–05(2) is "whether the arresting officer had reasonable grounds to believe the person had been driving or was in actual physical control of a vehicle" while

under the influence of alcohol. The term "reasonable grounds" used in N.D.C.C. § 39–20–05 is synonymous with the term "probable cause." *Rist v. North Dakota Dep't of Transp.*, 2003 ND 113, ¶ 15, 665 N.W.2d 45; *Henderson v. Dir., North Dakota Dep't of Transp.*, 2002 ND 44, ¶ 8, 640 N.W.2d 714. " 'Probable cause to arrest exists when the facts and circumstances within police officers' knowledge and of which they have reasonably trustworthy information are sufficient to warrant a person of reasonable caution in believing an offense has been or is being committed.' " *Rist*, at ¶ 15 (quoting *Henderson*, at ¶ 8). Knowledge of facts sufficient to establish guilt is not necessary to establish probable cause. *State v. Berger*, 2004 ND 151, ¶ 11, 683 N.W.2d 897. The totality of the circumstances must be considered. *Id.* "[T]he hearing officer's ultimate determination that the facts found meet the legal standard that the arresting officer had reasonable grounds to believe [a person] had been driving a vehicle in violation of section 39–08–01 is a question of law fully reviewable on appeal." *Stanton v. Moore*, 1998 ND 213, ¶ 10, 587 N.W.2d 148.

[¶ 10] Hoover argues the evidence is insufficient because the witnesses to the accident were unable to identify the driver and because he told Stein he had not been driving that evening. However, eyewitness testimony is not necessary to establish reasonable grounds to believe a person was driving under the influence; circumstantial evidence is sufficient. *See Stanton*, 1998 ND 213, ¶¶ 14–16, 587 N.W.2d 148; *State v. Rieger*, 281 N.W.2d 252, 255 (N.D.1979); *State v. Emmil*, 172 N.W.2d 589, 591 (N.D.1969).

[¶ 11] Here, the witnesses described the vehicle involved in the accident and told Stein the vehicle's license plate number and where the vehicle was driven after the accident. Stein was aware the vehicle was being driven erratically because the driver failed to negotiate a right turn at the intersection without hitting another vehicle and subsequently became stuck in snow. The vehicle was registered to Hoover, who lived close to the scene of the accident. Arriving at the house, Stein found Hoover to be extremely intoxicated. There is no evidence the other persons in the house were intoxicated. Stein saw the freshly damaged vehicle in the garage. Although Hoover denied driving that evening, neither his son nor his son's girlfriend claimed to have driven the vehicle, and Hoover presented no evidence who the driver may have been. *See Stanton*, at ¶ 15.

[¶ 12] Hoover told Stein he had consumed alcohol at a restaurant that evening, indicating he had to have returned home in some manner. After Stein viewed the damaged vehicle, Hoover told him he would retrieve his vehicle registration card which he claimed was located in his bedroom, an unlikely place to store a registration card. *See* N.D.C.C. § 39–04–55 ("The registration card issued for a vehicle must be carried in the driver's compartment of the vehicle … at all times while the vehicle is being operated upon a highway in this state."). Hoover attempted to get away from Stein. Once Hoover reached the bedroom, he attempted to drink from a whiskey bottle. A reasonable person could interpret Hoover's effort to ingest more alcohol as an attempt to mask his blood-alcohol level at the time of the accident. *See, e.g., State v. Miller*, 530 N.W.2d 652, 656 (N.D.1995); *City of Bismarck v. Preston*, 374 N.W.2d 602, 603 (N.D.1985); *State v. Falk*, 434 N.W.2d 364, 365–66 (N.D.Ct. App.1989).

[¶ 13] We conclude the totality of the circumstances in this case supports the hearing officer's determination that Stein had reasonable grounds to believe Hoover

was driving the vehicle under the influence of alcohol at the time of the accident.

### B

[¶ 14] Hoover argues Stein's warrantless entry into his bedroom violated his Fourth Amendment rights.

[¶ 15] Unreasonable searches and seizures are prohibited by the Fourth Amendment. U.S. Const. amend. IV; *State v. Mitzel*, 2004 ND 157, ¶ 11, 685 N.W.2d 120. " '[W]arrantless searches and seizures inside a home are presumptively unreasonable.' " *State v. Kochel*, 2008 ND 28, ¶ 7, 744 N.W.2d 771 (quoting *State v. Kitchen*, 1997 ND 241, ¶ 13, 572 N.W.2d 106). Consent and exigent circumstances are exceptions to the warrant requirement. *City of Fargo v. Lee*, 1998 ND 126, ¶¶ 9–10, 580 N.W.2d 580. To be effective, consent must be voluntarily given under the totality of the circumstances and "must not be coerced by explicit or implicit means or by implied threat or covert force." *State v. Avila*, 1997 ND 142, ¶ 16, 566 N.W.2d 410. We have defined exigent circumstances as " 'an emergency situation requiring swift action to prevent imminent danger to life or serious damage to property, or to forestall the imminent escape of a suspect or destruction of evidence.' " *State v. Matthews*, 2003 ND 108, ¶ 14, 665 N.W.2d 28 (quoting *City of Jamestown v. Dardis*, 2000 ND 186, ¶ 15, 618 N.W.2d 495). The Department has the burden of establishing an exception to the warrant requirement. *State v. Graf*, 2006 ND 196, ¶ 9, 721 N.W.2d 381.

[¶ 16] Hoover does not dispute he consented to Stein's entry into his home. Indeed, Hoover opened the door, stepped aside, and motioned for Stein to "come on in." Hoover argues, however, that he gave Stein permission to enter his home only to view his car in the garage and that his permission did not extend to having Stein follow him and enter his bedroom. Although the Department did not argue the scope of Hoover's consent to Stein to enter the home to view the vehicle in the garage included following him to his bedroom, the district court concluded, "[h]aving observed Hoover and having been invited into Hoover's house by Hoover, the officer did not violate any constitutional right of Hoover as the officer was legally in the house." *But see Mitzel*, 2004 ND 157, ¶ 15–18, 685 N.W.2d 120 (defendant's invitation to officers to enter apartment did not necessarily constitute voluntary consent to go to back bedroom). Rather, the Department argues exigent circumstances authorized Stein to follow Hoover and to enter his bedroom. We need not decide whether the scope of Hoover's consent extended to the bedroom or whether exigent circumstances existed, because under the circumstances, there is an independent basis that justified Stein's actions.

[¶ 17] In *Washington v. Chrisman*, 455 U.S. 1, 3, 102 S.Ct. 812, 70 L.Ed.2d 778 (1982), the United States Supreme Court considered "whether a police officer may, consistent with the Fourth Amendment, accompany an arrested person into his residence and seize contraband discovered there in plain view." In *Chrisman*, a police officer observed an apparently underaged college student leave a dormitory carrying a half-gallon bottle of gin, in violation of state law. *Id.* The officer stopped him and asked for identification; the student said he would have to retrieve it from his dormitory room. *Id.* The officer said he would have to accompany the student, and the student replied, "OK." *Id.* The officer accompanied the student to his room, eventually entered the room, and discovered drugs in plain view. *Id.* at 3–4, 102 S.Ct. 812. The Washington Supreme Court held, although the student had been

placed under lawful arrest and the officer could properly accompany the student to his room, the officer had no right to enter the room and examine or seize contraband without a warrant. *Id.* at 5, 102 S.Ct. 812.

[¶ 18] The Supreme Court reversed, concluding "the officer had placed [the student] under lawful arrest, and therefore was authorized to accompany him to his room for the purpose of obtaining identification. The officer had a right to remain literally at [the student's] elbow at all times; nothing in the Fourth Amendment is to the contrary." *Chrisman,* 455 U.S. at 6, 102 S.Ct. 812 (footnote omitted). The Supreme Court rejected the contention that exigent circumstances were required for the officer to enter the dormitory room:

> "We disagree with this novel reading of the Fourth Amendment. The absence of an affirmative indication that an arrested person might have a weapon available or might attempt to escape does not diminish the arresting officer's authority to maintain custody over the arrested person." See *Pennsylvania v. Mimms,* 434 U.S. 106, 109–110, 98 S.Ct. 330, 54 L.Ed.2d 331 (1977); *United States v. Robinson,* 414 U.S. 218, 234–236, 94 S.Ct. 467, 38 L.Ed.2d 427 (1973). Nor is that authority altered by .the nature of the offense for which the arrest was made.
>
> "Every arrest must be presumed to present a risk of danger to the arresting officer." Cf. *United States v. Robinson, supra,* at 234, n. 5, 94 S.Ct. 467. There is no way for an officer to predict reliably how a particular subject will react to arrest or the degree of the potential danger. Moreover, the possibility that an arrested person will attempt to escape if not properly supervised is obvious. Although the Supreme Court of Washington found little likelihood that [the student] could escape from his dormitory room, an arresting officer's custodial authority over an arrested person does not depend upon a reviewing court's after-the-fact assessment of the particular arrest situation. Cf. *New York v. Belton,* 453 U.S. 454, 458–460, 101 S.Ct. 2860, 69 L.Ed.2d 768 (1981); *United States v. Robinson, supra,* at 235, 94 S.Ct. 467.

> "We hold, therefore, that it is not 'unreasonable' under the Fourth Amendment for a police officer, as a matter of routine, to monitor the movements of an arrested person, as his judgment dictates, following the arrest. The officer's need to ensure his own safety—as well as the integrity of the arrest—is compelling. Such surveillance is not an impermissible invasion of the privacy or personal liberty of an individual who has been arrested."

*Id.* at 6–7, 102 S.Ct. 812 (footnote omitted). Although the defendant in *Chrisman* had been formally arrested, several courts have since applied *Chrisman's* reasoning to allow a police officer to accompany a suspect into dwellings in situations in which probable cause existed but formal arrests had not yet occurred. *See, e.g., State v. Mayfield,* 10 Kan.App.2d 175, 694 P.2d 915, 918 (1985) (although defendant had not been formally arrested, he had been "seized" for Fourth Amendment purposes when asked for his identification, and officers could lawfully accompany him into his apartment); *State v. Diercks,* 674 S.W.2d 72, 79 (Mo.Ct.App.1984) (although defendant had not been formally placed under arrest, officers had identified marijuana plants and read defendant his *Miranda* rights and therefore "had a right and a duty to monitor the defendant's movements" in home where bag of marijuana was found); *Washington v. Commonwealth,* 29 Va.App. 5, 509 S.E.2d 512, 516 (1999) (once officer has reasonable sus-

picion of criminal activity to stop and identify defendant, the officer may stay with defendant to keep him in sight, including accompanying defendant into rooms or premises); *Conway v. Commonwealth,* 12 Va.App. 711, 407 S.E.2d 310, 314–15 (1991) (same); *Servis v. Commonwealth,* 6 Va. App. 507, 371 S.E.2d 156, 161–62 (1988) (same); *cf. State v. Overby,* 1999 ND 47, ¶ 8, 590 N.W.2d 703 (warrantless search preceding arrest is reasonable under the Fourth Amendment "so long as probable cause to arrest existed before the search, and the arrest and search are substantially contemporaneous").

[¶ 19] In this case, Stein crossed the threshold of the home with Hoover's consent and had the opportunity to view Hoover's actions and demeanor at all times. Hoover invited Stein into his home to view the damaged vehicle through the home's entrance to the garage. Hoover appeared to Stein to be intoxicated and Hoover admitted drinking that evening at a restaurant. Hoover remained at the top of the stairs and acted suspiciously. Stein was becoming apprehensive. According to Stein, Hoover "kept on wanting to go back in the house, and I didn't want to lose contact with him." Hoover told Stein he needed to retrieve the vehicle registration card from the bedroom, which is not a normal place to keep the registration card. We conclude that, at this point in the encounter, Stein had probable cause to believe Hoover had been driving under the influence of alcohol. Whether Stein believed probable cause existed is irrelevant. " 'An officer's subjective intent plays no role in ordinary probable cause Fourth Amendment analysis.' " *State v. Washington,* 2007 ND 138, ¶ 17, 737 N.W.2d 382 (quoting *State v. Leher,* 2002 ND 171, ¶ 11, 653 N.W.2d 56). When probable cause exists to arrest a suspect and all that remains is the imminent formality of the arrest, the principles of *Chrisman* should apply. *Cf. Overby,* 1999 ND 47, ¶ 8, 590 N.W.2d 703 (" 'if the officer is entitled to make an arrest on the basis of information available to him before he searches, and as an incident to that arrest is entitled to make a reasonable search of the person arrested ..., there is nothing unreasonable in his conduct if he makes the search before instead of after the arrest' " (citation omitted)). Because Stein had probable cause to arrest Hoover, Stein "had a right to remain literally at [Hoover's] elbow at all times." *Chrisman,* 455 U.S. at 6, 102 S.Ct. 812. Consequently, Stein did not violate Hoover's Fourth Amendment rights by following him into the bedroom without a warrant.

### III

[¶ 20] The judgment is affirmed.

[¶ 21] GERALD W. VANDE WALLE, C.J., MARY MUEHLEN MARING, CAROL RONNING KAPSNER, and DALE V. SANDSTROM, JJ., concur.