NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO.  A-1207-13T3

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

JAMES L. LEGETTE,
a/k/a JAMES LEGGETTE, JR.,
a/k/a JAMES LEGETTE,

    Defendant-Appellant.

_____

APPROVED FOR PUBLICATION

May 18, 2015

APPELLATE DIVISION

Argued September 22, 2014 – Decided May 18, 2015

Before Judges Sabatino,[1] Guadagno and Leone.

On appeal from the Superior Court of New Jersey, Law Division, Atlantic County, Indictment Nos. 12-04-0932.

A.  Harold  Kokes  argued  the  cause  for appellant.

John J. Santoliquido, Assistant Prosecutor, argued  the  cause  for  respondent  (James  P. McClain,  Atlantic  County  Prosecutor, attorney; John Vincent Molitor, Assistant Prosecutor, of counsel and on the brief).

    The opinion of the court was delivered by

LEONE, J.A.D.

_____

[1] Judge Sabatino did not participate in oral argument.  He joins the opinion with the consent of the parties.  R. 2:13-2(b).

Defendant James Legette was properly detained by a police officer conducting an investigatory stop. Defendant sought to get his identification by entering his apartment, which the officer permitted on the condition that the officer accompany him. While in his apartment, defendant attempted to conceal the sweatshirt he was wearing which contained a firearm, but he was thwarted by the officer. Defendant appeals the denial of his motion to suppress the handgun, contending that the officer should not have been allowed to accompany him to the apartment.

The Fourth Amendment of the United States Constitution, and Article I, paragraph 7 of the New Jersey Constitution, "guarantee the right of people to be free of unreasonable searches and seizures in their homes." State v. Lamb, 218 N.J. 300, 314 (2014). Both the United States Supreme Court and the New Jersey Supreme Court have found that when individuals under arrest seek to enter their residence to obtain identification, clothing, or other items, it is reasonable and permissible for the police to accompany them to prevent them from escaping or endangering the police. Washington v. Chrisman, 455 U.S. 1, 102 S. Ct. 812, 70 L. Ed. 2d 778 (1982); State v. Bruzzese, 94 N.J. 210, 234 (1983), cert. denied, 465 U.S. 1030, 104 S. Ct. 1295, 79 L. Ed. 2d 695 (1984).

We apply those decisions to the situation here. The officer had valid authorization to detain defendant for an investigatory stop based on reasonable suspicion, and had a reasonable belief that defendant was armed and dangerous. We hold that an officer in that situation may accompany the detainee who chooses to enter his residence to obtain identification or other personal items. Accordingly, we affirm.

I.

At the suppression hearing, Officer Richard Dill testified to the following facts. Dill was a uniformed K-9 officer with ten years of experience in the Patrol Unit of the Somers Point Police Department. On the night of January 17, 2012, he was dispatched to investigate a noise complaint in a high-crime, high-narcotics apartment complex he patrolled regularly. As he drove through the complex, Dill saw defendant and another man standing on a common porch of the apartment building. Entering the building from another direction using a common hallway, Dill heard the two men yelling to people in an apartment where there was loud talking and music. After Dill neared the door to the common porch, defendant opened the door about twelve inches. Officer Dill smelled an overpowering odor of burnt marijuana coming through the open doorway.

Suspecting defendant was committing a criminal act involving marijuana, Officer Dill walked onto the common porch and identified himself. Defendant immediately turned and started walking at a fast pace into the parking lot. Dill told defendant to stop and asked where he was going. Defendant said he was going to his car. Dill asked if defendant had any identification. Defendant said his identification was up in his apartment, immediately volunteered to go into his apartment to get his ID, and started walking back to the apartment building.

Officer Dill told defendant, "I have to come with you to get [the ID]." Defendant did not protest and continued to walk into the building. As defendant was walking, Officer Dill noticed a bulge in the pocket of the grey hooded sweatshirt defendant was wearing. Dill was concerned it could be a weapon or contraband that defendant was attempting to conceal. Dill went with defendant because "he's a suspect at this point and I wasn't going to allow him out of my sight where he could possibly discard evidence of the crime being committed or possibly get any sort of weapon" that would endanger officer safety.

Accompanied by Officer Dill, defendant entered the apartment, went into the bedroom, picked up a wallet, removed his identification, and handed it to Dill. Neither defendant

nor the woman in the apartment protested Dill's accompanying defendant. Defendant and Dill went into the living room, where Dill radioed in the information from defendant's identification.

As Officer Dill was radioing, defendant took off his grey sweatshirt, handed it to the woman, and told her to put it in the bedroom. His suspicions further aroused, Dill stopped his radio transmission and told defendant: "we're going to need that sweatshirt." Defendant and Dill followed the woman back into the bedroom. Although she put the grey sweatshirt on the floor, defendant stepped over the grey sweatshirt and grabbed another sweatshirt from the closet. Dill picked up the grey sweatshirt from the floor, and said to defendant: "this is the sweatshirt you were wearing. We need this one." Defendant's attempts to get rid of the grey sweatshirt further raised Officer Dill's concern for his safety and the preservation of evidence.

Reentering the living room with defendant, and holding the grey sweatshirt, Officer Dill resumed calling in defendant's identification to check for outstanding warrants. Defendant became extremely nervous, repeatedly looked at the sweatshirt, and his demeanor became uncooperative.

Increasingly concerned for his safety, Officer Dill asked defendant to step back outside, where Dill's patrol vehicle, K-9 dog, and backup Officer Mark McElwee were. Once outside, Dill

asked defendant to have a seat on the building steps. Defendant started tying his shoe, causing concern he was preparing to flee. Dill placed the sweatshirt on the ground. Defendant kept looking at the sweatshirt and looking around nervously, so Dill informed him he was handcuffing and detaining him during the investigation, but was not arresting him.

When Officer Dill's warrant inquiry came back negative, he asked if he could check the sweatshirt, but defendant declined to consent. Dill said he would conduct a canine sniff of the sweatshirt, and to keep him from provoking the K-9 dog, he placed defendant in the back of the patrol vehicle. Dill got another sweatshirt and a towel from his police vehicle and placed them alongside the grey sweatshirt, but the dog put his nose in the grey sweatshirt, grabbed it in his mouth, and threw it to the pavement. It landed making a metal "clank" that sounded like a weapon. Dill picked up the sweatshirt, for the first time manipulated the pocket, and felt a metal handgun. The officer seized the loaded handgun.

Defendant was indicted for second-degree unlawful possession of a handgun without a permit, N.J.S.A. 2C:39-5(b), and second-degree possession of a weapon by a convicted person, N.J.S.A. 2C:39-7. He filed a suppression motion. After hearing the testimony and receiving supplemental briefing and argument,

the trial court denied the motion. Defendant pled guilty to possession of a weapon by a convicted person, and was sentenced to a negotiated term of five years in prison without eligibility for parole.[2] The trial court denied bail pending appeal.

Defendant appeals the October 11, 2013 judgment of conviction, raising the following issues:

> POINT I.     THE COURT ERRED IN DETERMINING DEFENDANT IS LIKELY TO FLEE IF ALLOWED BAIL PENDING APPEAL.
>
> POINT II.     DEFENDANT DOES NOT POSE A DANGER TO COMMUNITY.
>
> POINT III.     THERE ARE SUBSTANTIAL QUESTIONS OF FACT AND LAW THAT WERE RAISED IN DEFENDANT'S MOTION TO SUPPRESS.
>
> POINT IV.     INVALID TERRY STOP.
>
> POINT V.     SUBSEQUENT WARRANTLESS HOME INTRUSION AND FOURTH AMENDMENT.
>
> POINT VI.     PLAIN VIEW, PROBABLE CAUSE AND EXIGENT CIRCUMSTANCES.
>
> POINT VII.     WARRANTLESS UNLAWFUL SEIZURE AND ARREST OF DEFENDANT.
>
> POINT VIII.     OFFICER DILL'S TESTIMONY WAS NOT CREDIBLE AND WAS UNRELIABLE.
>
> POINT IX.     TRIAL COURT RULED ON FACTS THAT WERE OUTSIDE OF RECORD.

---

[2] Defendant's sentence was concurrent to a three-year sentence for an unrelated drug possession charge, and a one-year sentence for an unrelated obstruction charge.

A-1207-13T3

II.

We must hew to our "deferential standard of review." State v. Rockford, 213 N.J. 424, 440 (2013). "[A]n appellate court reviewing a motion to suppress must uphold the factual findings underlying the trial court's decision so long as those findings are supported by sufficient credible evidence in the record." Ibid. (internal quotation marks omitted). "Those findings warrant particular deference when they are substantially influenced by [the trial judge's] opportunity to hear and see the witnesses and to have the 'feel' of the case, which a reviewing court cannot enjoy." Ibid. (alteration in original; internal quotation marks omitted).

Here, the trial court found Officer Dill's testimony "very credible and reliable." Defendant argues the court should have discredited Dill because of differences in wording between his testimony and report, and a discrepancy between his time estimate and that of Officer McElwee. However, "[i]t is a deeply rooted principle of our jurisprudence that '[a]ppellate courts should defer to trial courts' credibility findings that are influenced by matters such as observations of the character and demeanor of witnesses and common human experience that are not transmitted by the record.'" State v. Segars, 172 N.J. 481, 500-01 (2002) (citation omitted). Defendant has not shown the

suppression court's findings were "'so clearly mistaken that the interests of justice demand intervention and correction.'" State v. Robinson, 200 N.J. 1, 15 (2009) (citation omitted).

Defendant also notes the trial court's letter opinion contained certain factual details not reflected in the suppression hearing testimony. We will base our determinations solely on the facts in the testimony, and consider the validity of each stage of Officer Dill's encounter with defendant.

A.

Defendant does not dispute that Officer Dill had the right to enter the common hallway of the apartment building to investigate the noise complaint. State v. Walker, 213 N.J. 281, 296 (2013); State v. Smith, 37 N.J. 481, 496 (1962); State v. Brown, 282 N.J. Super. 538, 547 (App. Div.), certif. denied, 143 N.J. 322 (1995).

When defendant opened the door of the common porch, Officer Dill detected the overwhelming odor of burnt marijuana. "'New Jersey courts have recognized that the smell of marijuana itself constitutes probable cause "that a criminal offense ha[s] been committed and that additional contraband might be present."'" Walker, supra, 213 N.J. at 290 (quoting State v. Nishina, 175 N.J. 502, 516-17 (2003) (quoting State v. Vanderveer, 285 N.J. Super. 475, 479 (App. Div. 1995))).

In <u>Vanderveer</u>, a police officer encountered two individuals on an outdoor porch and detected the odor of burnt marijuana. <u>Vanderveer</u>, <u>supra</u>, 285 <u>N.J. Super.</u> at 477, 479. We held the marijuana odor gave rise to probable cause "to conduct a warrantless search of the persons in the immediate area from where the smell has emanated." <u>Id.</u> at 481. Thus, Officer Dill had the right to search defendant.

### B.

Officer Dill chose to take a more restrained approach, simply entering the common porch to speak to defendant. <u>See</u> <u>State v. Johnson</u>, 171 <u>N.J.</u> 192, 209 (2002). When defendant tried to hurry away, Dill stopped him. The trial court properly found reasonable suspicion justifying this investigatory stop of defendant.

At a suppression hearing, "'the State bears the burden of proving by a preponderance of the evidence that a warrantless search or seizure falls within one of the few well-delineated exceptions to the warrant requirement.'" <u>State v. Mann</u>, 203 <u>N.J.</u> 328, 337-38 (2010) (citation omitted). "One such exception is denominated an investigatory stop or a <u>Terry</u> stop." <u>Id.</u> at 338 (citing <u>Terry v. Ohio</u>, 392 <u>U.S.</u> 1, 88 <u>S. Ct.</u> 1868, 20 <u>L. Ed.</u> 2d 889 (1968)). An investigatory stop "'is valid if it is based on specific and articulable facts which, taken together with

rational inferences from those facts, give rise to a reasonable suspicion of criminal activity.'" Ibid. (citation omitted).

As "'the smell of burnt marijuana under the total circumstances create[s] a heightened and reasonable suspicion that an offense was being committed,'" Dill was justified in stopping defendant. Walker, supra, 213 N.J. at 290 (quoting State v. Judge, 275 N.J. Super. 194, 202 (App. Div. 1994)). In addition, given the evidence that defendant just committed a marijuana offense, his hurried departure when the officer appeared "'reasonably justif[ied] an inference that it was done with a consciousness of guilt and pursuant to an effort to avoid an accusation based on that guilt.'" State v. Tucker, 136 N.J. 158, 169 (1994) (citation omitted).

Moreover, Officer Dill appropriately asked defendant to produce identification. "[I]t is well established that an officer may ask a suspect to identify himself in the course of a Terry stop." Hiibel v. Sixth Judicial Dist. Court, 542 U.S. 177, 186, 124 S. Ct. 2451, 2457, 159 L. Ed. 2d 292, 303 (2004); Michigan v. Summers, 452 U.S. 692, 700 n.12, 101 S. Ct. 2587, 2593, 69 L. Ed. 2d 340, 348 (1981). "[T]he ability to . . . check identification in the absence of probable cause promotes the strong government interest in solving crimes and bringing offenders to justice." United States v. Hensley, 469 U.S. 221,

229, 105 <u>S. Ct.</u> 673, 680, 83 <u>L. Ed.</u> 2d 604, 612 (1985); <u>see</u> <u>State v. Sirianni</u>, 347 <u>N.J. Super.</u> 382, 390-91 (App. Div.), <u>certif. denied</u>, 172 <u>N.J.</u> 178 (2002).

C.

When Officer Dill asked defendant for his identification, defendant said his ID was up in his apartment, immediately volunteered to go get it, and started walking to the apartment. Dill told defendant he would have to accompany defendant. Defendant claims the officer violated his rights by accompanying him into the apartment.[3]

The facts of this case strongly resemble the facts in <u>Chrisman</u>. There, a police officer saw a college student with alcohol and stopped him and asked for identification. <u>Chrisman</u>, <u>supra</u>, 455 <u>U.S.</u> at 3, 102 <u>S. Ct.</u> at 815, 70 <u>L. Ed.</u> 2d at 783. The student said that his ID was in his dormitory room and asked if the officer would wait while he went to retrieve it. <u>Ibid.</u> The officer answered that, under the circumstances, he would have to accompany the student. <u>Ibid.</u>

The United States Supreme Court held the officer could properly accompany the student into his dorm room, and upheld his plain view seizure of the drugs he saw in the room. <u>Id.</u> at

---

[3] At oral argument on appeal, defendant conceded the officer had not violated his rights prior to that time.

12                                                                      A-1207-13T3

7-9, 102 S. Ct. at 817-18, 70 L. Ed. 2d at 785-86. The Court ruled that "the officer had placed [the student] under lawful arrest, and therefore was authorized to accompany him to his room for the purpose of obtaining identification. The officer had a right to remain literally at [the student's] elbow at all times; nothing in the Fourth Amendment is to the contrary." Id. at 6, 102 S. Ct. at 816, 70 L. Ed. 2d at 784 (footnote omitted).

The Court "h[e]ld therefore that it is not 'unreasonable' under the Fourth Amendment for a police officer, as a matter of routine, to monitor the movements of an arrested person, as his judgment dictates, following the arrest." Id. at 7, 102 S. Ct. at 817, 70 L. Ed. 2d at 785. "The officer's need to ensure his own safety—as well as the integrity of the arrest—is compelling. Such surveillance is not an impermissible invasion of the privacy or personal liberty of an individual who has been arrested." Ibid.

In Bruzzese, our Supreme Court "adopt[ed] the Chrisman rule as the law of New Jersey." Bruzzese, supra, 94 N.J. at 234.[4]

---

[4] The Court noted that "our lower courts also have followed the Chrisman approach." Ibid. (citing, e.g., State v. Brown, 132 N.J. Super. 180, 184 (App. Div. 1975)). The Court disapproved the sole exception, State v. Seiss, 168 N.J. Super. 269 (App. Div. 1979), to the extent it "denies a police officer the unequivocal right to accompany a person he has lawfully arrested," ibid., and reversed the suppression court and panel majority which had relied on Seiss. Id. at 216, rev'g State v.
(continued)

There, when officers went to the defendant's house to execute an arrest warrant, the defendant said he wanted to put on shoes and a jacket before going outside. The officers, "[w]ithout invitation," followed the defendant upstairs to his bedroom, saying they had to accompany him. Id. at 215. Our Supreme Court upheld their actions, "rul[ing] that once a defendant is placed under lawful arrest, the arresting officer has the right to remain at his side and to follow him wherever he chooses to go." Id. at 232.

Our Supreme Court found "the reasons advanced by the Supreme Court for its holding [in Chrisman] are equally applicable in New Jersey." Ibid. Both Courts stressed "'[e]very arrest must be presumed to present a risk of danger to the arresting officer. . . . Moreover, the possibility that an arrested person will attempt to escape if not proper[ly] supervised is obvious.'" Id. at 231 (quoting Chrisman, supra, 455 U.S. at 7, 102 S. Ct. at 817, 70 L. Ed. 2d at 785).

"[T]he concerns [Chrisman found] present in an arrest situation may also be present in an investigatory detention." Servis v. Commonwealth, 371 S.E.2d 156, 162 (Va. Ct. App. 1988).

---

(continued)
Bruzzese, 187 N.J. Super. 435, 438-40 (App. Div. 1982); see also id. at 453, 455 (Milmed, P.J.A.D., dissenting) (following Chrisman and Brown and finding the right to accompany "well embedded in the law").

Both the United States and New Jersey Supreme Courts have found the danger of "'an on-the-street or roadside investigatory encounter'" to be comparable to "'[t]he risk of danger in the context of an arrest in the home.'" State v. Jones, 179 N.J. 377, 406 (2004) (quoting Maryland v. Buie, 494 U.S. 325, 333, 110 S. Ct. 1093, 1098, 108 L. Ed. 2d 276, 285 (1990)). Our Supreme Court has likened the public interest in preventing flight from an attempted arrest and an attempted investigatory stop because a "defendant's refusal to obey the officer's command to stop [can] set off a chase along with the attendant danger of escalating violence no different than if he had disobeyed a command to submit to an arrest." State v. Crawley, 187 N.J. 440, 457, cert. denied, 549 U.S. 1078, 127 S. Ct. 740, 166 L. Ed. 2d 563 (2006).

Federal Courts of Appeals have recognized that "[a]lthough the Supreme Court [in Chrisman] refers to the student as having already been placed under arrest when the officer accompanied him back to his dorm room to retrieve identification, we do not think that this characterization makes Chrisman any less applicable" to a pre-arrest situation. United States v. Roberts, 612 F.3d 306, 308, 310 n.4 (5th Cir.) (officers waiting for a defendant to get identification before executing an arrest warrant could accompany the defendant into his apartment), cert.

denied, 562 U.S. 1116, 131 S. Ct. 839, 178 L. Ed. 2d 570 (2010). Thus, where an officer has probable cause, but no plan to arrest the detainee unless he is unable to provide identification, "it is reasonable for police to keep him in view to ensure that credentials are the only object of the expedition." United States v. Garcia, 376 F.3d 648, 651-52 (7th Cir. 2004). Indeed, "several courts have since applied Chrisman's reasoning to allow a police officer to accompany a suspect into dwellings in situations in which probable cause existed but formal arrests had not yet occurred." Hoover v. Dir., N.D. Dep't of Transp., 748 N.W.2d 730, 737 (N.D. 2008); State v. Diercks, 674 S.W.2d 72, 79 (Mo. Ct. App. 1984).

Other courts have applied Chrisman to Terry stops where the officer has reasonable suspicion and a reasonable belief a suspect is "potentially dangerous." Conway v. Commonwealth, 407 S.E.2d 310, 313-15 & n.3 (Va. Ct. App. 1991) (en banc); Johnson v. State, 662 P.2d 981, 984, 987 (Alaska Ct. App. 1983); Servis, supra, 371 S.E.2d at 162. Some courts required only reasonable suspicion. State v. Mayfield, 694 P.2d 915, 917-18 (Kan. Ct. App. 1985); State v. Lupek, 712 S.E.2d 915, 920-21 (N.C. Ct. App. 2011); Washington v. Commonwealth, 509 S.E.2d 512, 516-17 (Va. Ct. App. 1999); Commonwealth v. Daniels, 421 A. 2d 721, 724-25 (Pa. Super. Ct. 1980) ("the police had sufficient grounds

to enter the bedroom [with the detainee] under the <u>Terry</u> analysis alone"). All of these cases hold that an officer can accompany a person detained in an investigatory stop who seeks to retrieve personal items from his residence. Our research has found no published case to the contrary.[5]

We agree an officer who has lawfully detained a suspect in an investigatory stop, like an officer who has lawfully arrested a subject, need not let the suspect out of his sight or presence during the detention. Rather, if the detained person seeks to obtain identification or other items from his residence, the officer may accompany the detainee to prevent escape or danger to the officer and others. Such monitoring is justified by the normal authority of an officer conducting a lawful <u>Terry</u> stop "'to take such steps as [are] reasonably necessary to protect [his and others'] personal safety and to maintain the status quo during the course of the stop.'" <u>Servis</u>, <u>supra</u>, 371 <u>S.E.</u>2d at 162 (quoting <u>Hensley</u>, <u>supra</u>, 469 <u>U.S.</u> at 235, 105 <u>S. Ct.</u> at 683-84, 83 <u>L. Ed.</u> 2d at 616).

---

[5] <u>Cf.</u> <u>Commonwealth v. Johnson</u>, 777 <u>S.W.</u>2d 876, 879-80 (Ky. 1989), <u>cert. denied</u>, 494 <u>U.S.</u> 1085, 110 <u>S. Ct.</u> 1823, 108 <u>L. Ed.</u> 2d 952 (1990) (where a person was neither arrested nor detained upon reasonable suspicion, but was simply tagging along with officers executing a warrant to search his car, the court was "not persuaded that the police are authorized, in anticipation of executing a search warrant upon a person's property in another location, to constantly observe him at a time at which he is not under arrest").

We recognize there are differences between a detention and an arrest. "[T]he privacy rights of an individual who is placed under lawful arrest are diminished." Bruzzese, supra, 94 N.J. at 232. Moreover, arrestees are more likely to want to retrieve items such as clothing or footwear because they are being taken to a police station. On the other hand, investigatory stops, like arrests, are "encounters with the police in which a person's freedom of movement is restricted," State v. Elders, 192 N.J. 224, 246 (2007), and the detainee may be subjected to the "invasion of privacy that occurs in a pat-down of a person's body," State v. Smith, 134 N.J. 599, 619 (1994). Moreover, detainees have not yet been searched and may not have been frisked. Thus, there is a greater risk that detainees, particularly unfrisked detainees, have on their persons weapons they could access, or contraband or evidence they could conceal or destroy, if left unaccompanied. A Terry stop "'involves a police investigation "at close range" . . . when the officer remains particularly vulnerable in part because a full custodial arrest has not been effected.'" State v. Carter, 235 N.J. Super. 232, 239 n.4 (App. Div. 1989) (citation omitted); Servis, supra, 371 S.E.2d at 162. By accompanying the detainee, the officer can better act "at the first indication that he was in danger, or that evidence might be destroyed," Chrisman, supra,

455 <u>U.S.</u> at 9, 102 <u>S. Ct.</u> at 818, 70 <u>L. Ed.</u> 2d at 786, and better "prevent [the detainee's] escape," <u>Bruzzese</u>, <u>supra</u>, 94 <u>N.J.</u> at 234.

Moreover, as the high courts observed in <u>Chrisman</u> and <u>Bruzzese</u>, permitting such monitored movement may benefit the suspects who desire to get identification, clothing, or similar items. "Indeed, were the rule otherwise, it is doubtful that an arrested person would ever be permitted to return to his residence, no matter how legitimate the reason for doing so. Such a rule would impose far greater restrictions on the personal liberty of arrested individuals than those occasioned here." <u>Chrisman</u>, <u>supra</u>, 455 <u>U.S.</u> at 7 n.4, 102 <u>S. Ct.</u> at 817, 70 <u>L. Ed.</u> 2d at 785; <u>see</u> <u>Bruzzese</u>, <u>supra</u>, 94 <u>N.J.</u> at 234 (finding "the <u>Chrisman</u> rule offers a sensible middle ground"). Such monitored movement may benefit detainees even more than arrestees because it could enable them to dispel police suspicions. Many detainees would "welcome the opportunity to find their driver's licenses and thus avoid full custodial arrest." <u>Garcia</u>, <u>supra</u>, 376 <u>F.</u>3d at 651.

The Supreme Courts in <u>Chrisman</u> and <u>Bruzzese</u> held that officers can accompany arrestees as a matter of course, without a special showing. "The absence of an affirmative indication that an arrested person might have a weapon available or might

attempt to escape does not diminish the arresting officer's authority to maintain custody over the arrested person." Chrisman, supra, 455 U.S. at 6, 102 S. Ct. at 816-17, 70 L. Ed. 2d at 785. "The officer need not posit any special need for the accompaniment so long as the arrest is lawful." Bruzzese, supra, 94 N.J. at 232. "'There is no way for an officer to predict reliably how a particular subject will react to arrest or the degree of the potential danger,'" and there is "the constant risk that the arrested defendant will seek to escape." Id. at 231, 234 (quoting Chrisman, supra, 455 U.S. at 7, 102 S. Ct. at 817, 70 L. Ed. 2d at 785). The same could be said about Terry stops.

Here, the circumstances justified Officer Dill accompanying defendant. Dill clearly had reasonable suspicion that defendant engaged in a marijuana offense. Defendant's attempt to evade Dill by rushing off to his car gave reason to believe defendant would flee if allowed to head toward his apartment unaccompanied.

Moreover, after defendant started walking to his apartment, the officer noticed a bulge in the pocket of defendant's grey sweatshirt. "The bulge in the [defendant's] jacket permitted the officer to conclude that [he] was armed and thus posed a serious and present danger to the safety of the officer."

_Pennsylvania v. Mimms_, 434 _U.S._ 106, 111-12, 98 _S. Ct._ 330, 334, 54 _L. Ed._ 2d 331, 337-38 (1977). "Indeed, a bulge alone has been held sufficient to validate a protective pat-down." _Smith_, _supra_, 134 _N.J._ at 621.

Thus, the circumstances here provided not only reasonable suspicion defendant was involved in crime, but also reasonable suspicion that he was armed and dangerous. The circumstances clearly justified Officer Dill in accompanying defendant to prevent him from escaping, accessing a possible weapon in his sweatshirt or his residence, or concealing or destroying the possible contraband in the sweatshirt.

Because both types of reasonable suspicion are present here, we need not decide whether reasonable suspicion that a detainee was involved in crime is itself sufficient to justify accompanying the detainee. However, we do not believe probable cause is necessary to justify accompanying a detainee in a _Terry_ stop to prevent attack or escape. "'The Fourth Amendment does not require a policeman who lacks the precise level of information necessary for probable cause to arrest to simply shrug his shoulders and allow a crime to occur or a criminal to escape.'" _State v. Arthur_, 149 _N.J._ 1, 8 (1997) (quoting _Adams v. Williams_, 407 _U.S._ 143, 145, 92 _S. Ct._ 1921, 1923, 32 _L. Ed._ 2d 612, 616 (1972)). Instead, the officer is permitted to

detain the defendant during the Terry stop and prevent his escape.

Defendant stresses Officer Dill was investigating a noise complaint and a marijuana offense. However, an "officer's authority to maintain custody over" a defendant is not "altered by the nature of the offense." Chrisman, supra, 455 U.S. at 6-7 & n.3, 102 S. Ct. at 816-17, 70 L. Ed. 2d at 784-85. Moreover, the officer's authority to maintain custody allows him to accompany the defendant "as a matter of routine"; the Court rejected defendant's claim that "'exigent circumstances'" are required. Id. at 6-7, 11, 102 S. Ct. at 816-17, 819, 70 L. Ed. 2d at 785, 788 (citation omitted).

For the reasons above, we apply Chrisman and Bruzzese and conclude Officer Dill's action of accompanying defendant to his apartment "was reasonable, and hence, constitutional, under both the Fourth Amendment of the United States Constitution and Article I, paragraph 7 of the New Jersey Constitution." Bruzzese, supra, 94 N.J. at 235. We note that "the police did not create the scenario that prompted defendant to return to his [apartment]." Ibid. "It was the defendant himself who decided to go [there]." Ibid. "The police did not order or even

suggest that defendant" do so. Ibid.[6] "[T]he policeman's act of following defendant [to his apartment] was a reasonable consequence of defendant's own voluntary choice to go" there to get his identification. Ibid.

We emphasize that a detainee may choose not to enter his residence once he becomes aware an officer must accompany him. As Bruzzese stated, "even after the police told the defendant they would have to accompany him, he could have declined to go [into his apartment] or asked [a third party] at that point to get his [identification]." Ibid. If defendant had elected not to enter his apartment, "the officers could not have entered [it] without a search warrant." Ibid.

Thus, a defendant holds the key to whether there is accompanied entry into the residence, because it is based on his own entry, and it cannot occur if he decides not to enter accompanied. Here, defendant turned that key by continuing into his apartment after learning that the officer would have to accompany him.

---

[6] Nothing in the record suggests Dill accompanied defendant "to conduct an exploratory search of his [apartment]." Ibid. In any event, "the proper inquiry for determining the constitutionality of a search-and-seizure is whether the conduct of the law enforcement officer who undertook the search was objectively reasonable, without regard to his or her underlying motives or intent." Id. at 219.

Given that the defendant holds the key, our Supreme Court in <u>Bruzzese</u> authorized officers to accompany an arrestee into his home even though "one of this country's most protected rights throughout history has been the sanctity and privacy of a person's home," and that courts have "applied a more stringent standard . . . to searches of a residential dwelling."  <u>Id.</u> at 217.  The Court emphasized that "the touchstone of the Fourth Amendment is reasonableness," and that the officer's action in following the defendant into his home "was reasonable, and hence, constitutional, under both the Fourth Amendment of the United States Constitution and Article I, paragraph 7 of the New Jersey Constitution."  <u>Id.</u> at 217, 235.

We similarly recognize that "'physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed.'"  <u>State v. Vargas</u>, 213 <u>N.J.</u> 301, 313 (2013) (quoting <u>United States v. U.S. Dist. Court</u>, 407 <u>U.S.</u> 297, 313, 92 <u>S. Ct.</u> 2125, 2134, 32 <u>L. Ed.</u> 2d 752, 764 (1972)).  "The Fourth Amendment and the New Jersey Constitution assure the 'highest degree of protection to privacy interests within the home.'"  <u>State v. Coles</u>, 218 <u>N.J.</u> 322, 337 (2014) (citation omitted).  "Both protect against unreasonable searches and regard the warrantless entry into a person's home as 'presumptively unreasonable.'"  <u>Ibid.</u> (citation omitted).

Nonetheless, like the Supreme Court in Bruzzese, "we balance, as we must in all search and seizure cases, the interests of public safety, in this instance the protection of policemen, against the intrusion." Bruzzese, supra, 94 N.J. at 232. We similarly conclude the "officer is entitled to the protection he or she would receive under this rule," and that it is "reasonable to permit policemen to keep [detained] persons in sight and within reach to prevent their escape." Id. at 232, 234. This is particularly true where, as here, there is a reasonable belief they may be armed and dangerous.

D.

Once defendant entered his apartment, he provided Officer Dill further grounds for believing his grey sweatshirt contained a weapon or other contraband. Defendant removed the grey sweatshirt and instructed his female companion to put it in the bedroom while the officer was busy, and then suspiciously stepped over the grey sweatshirt to grab another sweatshirt from the closet. Given this indication that defendant was trying to conceal evidence, Dill "had unrestricted access to the [apartment]" to prevent it. Chrisman, supra, 455 U.S. at 9, 102 S. Ct. at 818, 70 L. Ed. 2d at 786.

Indeed, Officer Dill would have been justified in seizing and searching the sweatshirt "under the well-recognized 'plain

view' exception to a warrantless seizure of property under the Fourth Amendment." Bruzzese, supra, 94 N.J. at 235-36, 239 (upholding the plain view seizure and inspection of boots). The officer was "lawfully in the viewing area." Id. at 236. As set forth below, he had "'probable cause to associate the [sweatshirt] with criminal activity'" based on what he "'reasonably knew at the time of the seizure.'" Johnson, supra, 171 N.J. at 213 (quoting Bruzzese, supra, 94 N.J. at 237). Finally, Dill "discover[ed] the evidence 'inadvertently,' 'meaning that he did not know in advance where evidence was located nor intend beforehand to seize it.'" Id. at 206 (quoting Bruzzese, supra, 94 N.J. at 236). Because he "did not know in advance that evidence would be found in" the grey sweatshirt before he first encountered defendant, he did not use "the plain-view doctrine only as a pretense" to avoid getting a warrant in advance of the encounter. Id. at 211-13; see also State v. Padilla, 321 N.J. Super. 96, 109 & n.7 (App. Div. 1999), aff'd o.b., 163 N.J. 3 (2000).

Once again, Officer Dill chose a more restrained approach and simply secured the grey sweatshirt rather than immediately searching it. Invalidating his actions "would have the perverse effect of penalizing the officer for exercising more restraint

26                                                                    A-1207-13T3

than was required under the circumstances." Chrisman, supra, 455 U.S. at 8, 102 S. Ct. at 817, 70 L. Ed. 2d at 786.

Moreover, Officer Dill's monitoring of defendant's movements was "conducted in an objectively reasonable fashion." Bruzzese, supra, 94 N.J. at 234. He did not "'lead the accused from place to place and attempt to use his presence in each location to justify a search'" of the apartment. Id. at 234-35 (citation omitted). Instead, he simply insisted that defendant keep the sweatshirt he had been wearing, and accompanied him to retrieve it. Dill also did not "direct [defendant] to go to another area without a legitimate reason grounded in the safety of the police or the public." Ibid. Instead, when defendant became extremely nervous, repeatedly looked at the sweatshirt, and became uncooperative, Dill directed defendant back outside of the apartment where the stop could be conducted with greater safety for the officer.[7]

### E.

Defendant's increasing nervousness, uncooperativeness, and apparent preparation to flee led Officer Dill, whose backup officer was leaving to investigate another person, to handcuff

---

[7] Officer Dill estimated they had spent only about three minutes in the apartment. Officer McElwee said it "was probably five, ten minutes." Neither time period suggests, and defendant does not contend, that his detention exceeded the permissible duration of a Terry stop.

defendant. Dill then conducted a canine sniff of defendant's sweatshirt, placing him in the police car to prevent him from triggering any protective efforts by the police dog. The metal clank resulting from the canine sniff gave further proof that the sweatshirt contained a weapon, as the subsequent search confirmed.

The trial court properly found these precautions were reasonable and not unnecessarily intrusive under the circumstances. "The touchstone of a court's analysis under the Fourth Amendment is, as always, '"the reasonableness in all the circumstances of the particular governmental invasion of a citizen's personal security."'" Smith, supra, 134 N.J. at 614 (quoting Mimms, supra, 434 U.S. at 109, 98 S. Ct. at 332, 54 L. Ed. 2d at 335 (quoting Terry, supra, 392 U.S. at 19, 88 S. Ct. at 1878-79, 20 L. Ed. 2d at 904)). "Authorities must be allowed 'to graduate their response to the demands of any particular situation.'" United States v. Montoya De Hernandez, 473 U.S. 531, 542, 105 S. Ct. 3304, 3311, 87 L. Ed. 2d 381, 392 (1985) (citation omitted).

Defendant contends the officer's precautions exceeded the scope of a Terry stop. "'[A]n investigative stop becomes a de facto arrest when the officers' conduct is more intrusive than necessary for an investigative stop.'" State v. Dickey, 152

N.J. 468, 478 (1998) (citation and other internal quotation marks omitted). "'[F]actors that may weigh in favor of an arrest are subjecting a suspect to unnecessary delays, handcuffing him, or confining him in a police car.'" Id. at 479 (citation omitted). However, handcuffing does not necessarily "establish[] the fact of an arrest." Id. at 483. Further, our Supreme Court has refused "to hamstring the police officers' on-the-scene determination to keep defendant detained in the patrol car" during a Terry stop if their investigation requires them to divert their attention from the defendant. Coles, supra, 218 N.J. at 347.

Moreover, "conducting a dog sniff [does] not change the character of a [Terry] stop that is lawful at its inception and otherwise executed in a reasonable manner," because it "generally does not implicate legitimate privacy interests." Illinois v. Caballes, 543 U.S. 405, 408-09, 125 S. Ct. 834, 837-38, 160 L. Ed. 2d 842, 847 (2005); see also State v. Cancel, 256 N.J. Super. 430, 434-37 (App. Div. 1992), certif. denied, 134 N.J. 484 (1993). Officer Dill had reasonable suspicion that defendant's sweatshirt contained drugs or a weapon, and the K-9 dog trained to detect drugs was immediately available to conduct a dog sniff for drugs. Indeed, an officer in a lawful investigatory stop may conduct a dog sniff even if it "prolongs

the stop" to a reasonable extent needed to complete the dog sniff procedure, so long as the officer has "reasonable suspicion" of drug possession. Rodriquez v. United States, 575 U.S. __ , __ S. Ct. __ , __ L. Ed. 2d __ (2015) (slip op. at 6-8); State v. Baum, 393 N.J. Super. 275, 290 (App. Div. 2007), aff'd as modified, 199 N.J. 407 (2009).[8]

Even if Officer Dill's actions of handcuffing defendant and placing him in the police vehicle converted the investigatory stop into a de facto arrest, those actions are valid if "supported by probable cause." Coles, supra, 218 N.J. at 346. As set forth above, "the smell of marijuana itself constitutes probable cause 'that a criminal offense had been committed.'" Walker, supra, 213 N.J. at 290 (citations omitted).[9] Indeed,

---

[8] The resulting clanking noise made by the gun was the product of a legal canine sniff, regardless of whether the dog was trained to search for a gun.

[9] "Possession of . . . marijuana" remains an offense. N.J.S.A. 2C:35-10(a)(3)-(4); see N.J.S.A. 2C:35-2, 24:21-5(e)(10) (defining marijuana as a Schedule I controlled dangerous substance). Neither party has invoked the New Jersey Compassionate Use Medical Marijuana Act, N.J.S.A. 24:6I-1 to -16, which seeks "to protect from arrest, prosecution, property forfeiture, and criminal and other penalties, those [registered qualifying] patients who use marijuana to alleviate suffering from debilitating medical conditions." N.J.S.A. 24:6I-2(e). Moreover, there is no claim or evidence here that defendant or anyone using marijuana on the porch was an "authorized holder of an appropriate registration, permit or order form" under that Act, which is an affirmative defense. N.J.S.A. 2C:35-18; see
(continued)

this probable cause arguably gave the officer the right to arrest defendant for committing a marijuana offense in his presence.  See id. at 295-96.[10]

Defendant's hurrying away from the officer suggested defendant had committed that offense, and arguably "converted articulable suspicion into probable cause."  State v. Ramos, 282 N.J. Super. 19, 22 (App. Div. 1995).  The high level of suspicion was only increased by the bulge in defendant's grey sweatshirt, his attempt to conceal the grey sweatshirt, and his suspicious act of stepping over this grey sweatshirt to get another sweatshirt.  Considering "the totality of the circumstances," there was "'a well grounded suspicion that a crime has been or is being committed'" before Dill secured the sweatshirt in the apartment.  State v. Basil, 202 N.J. 570, 585, 589 (2010) (citation omitted).  Defendant only added further

_____

(continued)
N.J.S.A. 24:6I-3, -4, -5, -6(e); N.J.A.C. 8:64-2.5, -3.1. Accordingly, we need not address the effect of that Act.

[10] N.J.S.A. 40A:14-152.1 allows "arrest for any crime committed in [an] officer's presence."  N.J.S.A. 40A:14-152 allows "arrest [of] any disorderly person or any person committing a breach of the peace" "upon view," ibid., that is, "in the presence of the arresting officer."  State v. Dangerfield, 171 N.J. 446, 460 (2002); see Walker, supra, 213 N.J. at 286.  "The 'in presence' requirement . . . is satisfied by the [officer's] use of his sense of smell in much the same manner as if he had used his sight or hearing or touch[.]"  Judge, supra, 275 N.J. Super. at 203.

suspicion by his escalating nervousness and preparation to flee. Therefore, there was plainly probable cause to arrest defendant before he was handcuffed or confined, and even before Dill secured the sweatshirt in the apartment.

It is "'irrelevant'" whether Officer Dill had the subjective belief he had probable cause to arrest. State v. O'Neal, 190 N.J. 601, 613-14 (2007) (citation omitted). As Bruzzese held, "[i]n determining whether a police officer's actions are constitutional, we do not rely on the officer's own subjective appraisal, but upon an objective evaluation by a neutral judicial authority." Bruzzese, supra, 94 N.J. at 219-20. "Although an officer may testify to his or her subjective intent, the crucial inquiry is whether the officer's conduct was objectively reasonable." O'Neal, supra, 190 N.J. at 614. "'An action is reasonable under the Fourth Amendment, regardless of the individual officer's state of mind, as long as the circumstances, viewed objectively, justify [the] action.'" Id. at 613-14 (quoting Brigham City v. Stuart, 547 U.S. 398, 404, 126 S. Ct. 1943, 1948, 164 L. Ed. 2d 650, 658 (2006) (internal quotation marks omitted)).

"[T]he fact that the officers did not believe there was probable cause and proceeded on a consensual or Terry-stop rationale would not foreclose the State from justifying [a

defendant's] custody by proving probable cause." Florida v. Royer, 460 U.S. 491, 507, 103 S. Ct. 1319, 1329, 75 L. Ed. 2d 229, 242 (1983) (plurality opinion) (citing Sibron v. New York, 392 U.S. 40, 66-67, 88 S. Ct. 1889, 1904, 20 L. Ed. 2d 917, 936-37 (1968)). Thus, in O'Neal, our Supreme Court upheld a purported Terry stop because "objectively, [the officers] had probable cause," and "could have immediately placed him under arrest, searched him, and seized the bag of drugs as a search incident to a lawful arrest." O'Neal, supra, 190 N.J. at 607, 611, 613-14. Similarly, even if Officer Dill's precautions made this a de facto arrest, probable cause justified arrest, the search of defendant's sweatshirt, and the seizure of the gun. See id. at 613-14.

F.

At the suppression hearing, the parties cited Chrisman and Bruzzese, which the State urged authorized Officer Dill to accompany defendant into his apartment. The trial court agreed "the police acted within their authority in following the Defendant into the apartment." However, in its appellate brief, the State without explanation abandoned that position, and instead argued that we should uphold the denial of suppression on the grounds of inevitable discovery.

At oral argument, the State clarified it was not confessing error in the trial court's ruling, but merely offering a new, alternative basis for affirmance. Regardless, any confession of error would not be binding on this court. State v. Josey, 290 N.J. Super. 17, 32 (App. Div.), certif. denied, 146 N.J. 497 (1996). "[A] confession of error by the State must be taken into account by an appellate court but is not a controlling factor," and "'does not relieve this [c]ourt of the performance of the judicial function.'" Ibid. (quoting Young v. United States, 315 U.S. 257, 258, 62 S. Ct. 510, 511, 86 L. Ed. 832, 834-835 (1942)). The trial court has made a ruling, and "'our judicial obligations compel us to examine independently the errors confessed.'" Id. at 32 (quoting Young, supra, 315 U.S. at 258-59, 62 S. Ct. at 511, 86 L. Ed. at 835). Our analysis finds no error by the trial court.

Thus, we do not consider the State's new inevitable discovery argument, which was raised for the first time on appeal, without the necessary facts being developed in the trial court. State v. Bradley, 291 N.J. Super. 501, 516 (App. Div. 1996); see State v. M.A., 402 N.J. Super. 353, 358 n.1 (App. Div. 2008); see generally State v. Robinson, 200 N.J. 1, 18-22 (2009).

Defendant's appellate brief also challenged the sentencing court's denial of bail pending appeal. He did not file a motion in this court seeking bail pending appeal under Rule 2:9-4. A defendant requesting bail pending appeal should raise that issue by motion filed promptly after filing the appeal, to bring the request to our attention earlier. At this point, the appeal is no longer pending before us and the issue is moot.

In any event, a defendant may only receive bail pending appeal "if it appears that the case involves a substantial question that should be determined by the appellate court, that the safety of any person or of the community will not be seriously threatened if the defendant remains on bail and that there is no significant risk of defendant's flight." Ibid. The sentencing court found that the safety of the community would be seriously threatened given defendant's firearm conviction and criminal history, and that there was a significant risk of flight as he was facing a substantial prison sentence.

"The setting of bail is vested in the sound discretion of the trial court, and we consequently review the trial court's decision for an abuse of discretion." State v. Steele, 430 N.J. Super. 24, 34 (App. Div.), appeal granted, 214 N.J. 233 (2013),

appeal dismissed, __ N.J. __ (2014).  Even assuming the appeal

presents a substantial question, we find no abuse of discretion.

Affirmed.

I hereby certify that the foregoing
is a true copy of the original on
file in my office.

CLERK OF THE APPELLATE DIVISION

A-1207-13T3